# Richmond

KIAH T. FORD AND V. HOWARD FORD, TRADING AS KIAH
T. FORD AND COMPANY v. W. T. GIBSON.

June 19, 1950.

Record No. 3660.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan
and Miller, JJ.

The opinion states the case.

*Perrow & Rosenberger* and *William Lyne Wilson*, for the plaintiffs in error.

*Oliver & Padgett*, for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Kiah T. Ford and V. Howard Ford, real estate brokers trading as Kiah T. Ford and Company, brought this action against W. T. Gibson, claiming $2,750 commissions on the sale of Gibson's farm, in Bedford county, to J. E. Hilton. The sale was made direct by Gibson to Hilton but the plaintiffs claim they were the procuring cause of the sale and entitled to commissions under a verbal contract with Gibson. A jury found that the plaintiffs were not entitled to commissions and a judgment for defendant was entered, to which this writ of error was granted the plaintiffs.

In November, 1945, Kiah T. Ford came to see Gibson at his farm and procured from him a letter dated November 6, 1945, giving the plaintiffs "the exclusive sale of my farm,"

for a period of twelve months, at the price of $30,000 cash, including certain personal property, and providing for a commission of ten per cent to the plaintiffs for selling the property.

J. E. Hilton, who lived in Tennessee, wanted to sell his farm there and buy one in Virginia. In July, 1946, he called at the office of plaintiffs, in Lynchburg, having seen their advertisements of farms · for sale. Howard Ford showed him two farms, one of which was the farm owned by Gibson. They did not see Gibson on that visit, and spent thirty minutes, or less, looking over the place. Hilton was not interested in buying it at $30,000, and after looking at some other places he went back to Tennessee.

At or about November 6, 1946, when the exclusive listing agreement was to terminate, and no sale had been made, plaintiffs made several efforts to have Gibson execute another exclusive selling contract, but he refused to do so. Plaintiffs claim, however, that they then had a verbal understanding with Gibson that they might continue to try to sell the property. They do not claim that this understanding was for an exclusive right, or for any definite time or for any definite price. Kiah T. Ford testified that "the only thing we had was the right to show it with the assurance he would pay us;" that it was not an exclusive right and he presumed Gibson had the right to sell it himself. Howard Ford testified that Gibson stated that "we could continue to show the property and offer it for sale and he would pay us our commission." Plaintiffs claimed that during the period of the "verbal listing" they showed the property on a number of occasions to others than Hilton, but they could not give the dates or the names of the parties.

In the latter part of 1946 or early in 1947, plaintiffs showed the property to Roy Murray in an effort to sell it to him, but no sale was made. Murray, who was an associate of one Crumpecker, later made an arrangement with plaintiffs, which Gibson denied having any knowledge of, for a division of commissions, and pursuant thereto Murray and

Crumpecker took clients out on several occasions to look at the farm, but they made no sale.

In June, 1947, Hilton disposed of his farm in Tennessee. Thereafter he looked at other farms there and then he and his stepson, Kemery, came back to Virginia looking for a farm. On Sunday, July 6, 1947, they stopped at the Gibson farm and found Gibson milking. Hilton told Gibson he was looking for a farm, but did not tell him who he was and he was not there longer than fifteen minutes. He went on to Lynchburg, called at plaintiffs' office next morning, and one of them showed him two or three places that day, but did not show him the Gibson farm, and according to Hilton and Kemery he did not offer to take them there and did not mention that farm to Hilton. One of the farms shown to Hilton was called Scotland. Hilton told Ford he would go home and see his family and if it suited them they could probably trade for Scotland.

July 8, 1947, Tuesday, Hilton and Kemery looked at farms in the Richmond area and that night came back to the Gibson place. Gibson then made Hilton a price of $26,000 for the farm and personal property. Hilton asked whether the property was still in the real estate agents' hands and Gibson said it was not. Hilton went back home, called plaintiffs and told them he did not want the Scotland farm. On July 10 he came back, closed the deal with Gibson and a deed was made on July 11.

Plaintiffs claim they were the procuring cause of that sale. At their instance the court instructed the jury that if they interested Hilton in the purchase of the farm during the life of the exclusive contract, and that after that contract expired Gibson either verbally gave the plaintiffs the right to sell as general agents, or they continued their efforts to do so with the knowledge and consent of Gibson, and that the sale to Hilton was consummated or in process of being consummated before plaintiffs' authority was withdrawn by Gibson, then plaintiffs were entitled to recover.

On the issue so made, the jury found against the plaintiffs, as stated, and their verdict settles the conflicts in the evidence in defendant's favor.

A broker's right to commissions must, of course, be based on a valid contract, express or implied. *Wilson v. Schmidt & Wilson, Inc.*, 184 Va. 642, 655, 35 S. E. (2d) 737, 742; 8 Am. Jur., Brokers, sec. 158, p. 1077.

In their evidence plaintiffs asserted that they had an express verbal contract with Gibson as described above. Gibson testified flatly that he did not enter into any kind of contract with the plaintiffs after their written contract expired. After the jury's verdict for the defendant, it must be taken as established that there was no such verbal understanding.

Plaintiffs claim here, however, that the verdict should not stand for the reason that they procured the purchaser for the property with knowledge and acceptance of their services by the owner before there was any effective termination by him of their right to make the sale. The record does not, in our opinion, sustain that contention.

In order to establish an implied contract, the plaintiffs must show that they performed services which were the procuring cause of the sale, and under such circumstances as to give the owner reason to believe they were performed with the expectation of compensation, not done gratuitously or for some other person; that is, there must be evidence enough to show that the owner accepted them as his agents. 8 Am. Jur., Brokers, sec. 159, p. 1078. Gibson denied any intention to continue them as his agents after the written contract expired, evidenced, he claimed, by his refusal to sign another contract. His explanation was that when they came to his place he did not feel like running them off, "so I just let them alone and didn't bother them."

As said in *Smith-Gordon Co. v. Snellings*, 130 Va. 528, 530, 107 S. E. 651, 652, the argument of plaintiff's attorney, while forceful if addressed to the jury, "cannot be effective here because based upon certain conflicts in the testimony

and upon inferences adverse to the defendant, drawn from statements which he considers evasive, and from which he concludes that there was a fraudulent conspiracy to deprive his client of commissions justly due."

On the evidence the jury had a right to find that the plaintiffs were not the procuring cause of the sale. Kiah Ford testified that he did not personally make, nor did he know of any of his agents making, any effort to sell the Gibson farm to Hilton after the written contract had expired; and Howard Ford could point to no further effort to sell to Hilton after the one time he took him to see the place in July, 1946, during the term of the written contract. Hilton testified that except for that one occasion, nobody made any effort to sell the Gibson farm to him, and from that time until he bought the farm he received no literature or letter from the plaintiffs about it, but they did write him about other property. Not only so, but when he came back and called on the plaintiffs on July 7, 1947, the day before he bought the place, they showed him two or three other farms but did not mention the Gibson place to him. The sole fact that in the life of their exclusive contract plaintiffs showed the farm to Hilton, but did not sell it to him and made no further effort to do so, did not, certainly as a matter of law, make them the procuring cause of the sale made by the owner a year afterwards, and eight months after their exclusive contract had expired.

Whether a broker is the procuring cause of a sale of property listed with him is usually a question of fact. *Rosenfield* v. *Wall*, 94 Conn. 418, 109 A. 409, 9 A. L. R. 1189, and note at p. 1194; *Shea Realty Corp.* v. *Page*, 111 Va. 490, 69 S. E. 327.

To be the procuring cause of a sale the broker must have originated or caused a series of events which, without break in their continuity, result in the accomplishment of the prime object of his employment, which is, usually, to procure a purchaser ready, willing and able to buy on the owner's terms. *Wilson* v. *Schmidt & Wilson, Inc.*,

*supra*, 184 Va. at p. 649, 35 S. E. (2d) at p. 740. If his employment is to *sell*, he is not entitled to compensation until he procures a sale or a valid and enforceable contract of sale. *Snider* v. *New River Ins., etc., Corp.*, 187 Va. 548, 47 S. E. (2d) 398.

In *Leicht-Benson, etc., Corp.* v. *Stone & Co.*, 138 Va. 511, 121 S. E. 883, 43 A. L. R. 1100, this court said that a broker to be entitled to his commission must succeed. He may devote his time, labor and money in an effort to procure a purchaser, yet if he fails, abandons his efforts, or his authority is fairly and in good faith terminated, he does not earn his commission. A volunteer cannot recover commissions merely because he introduced the customer who finally bought from the owner. If the broker has failed to produce a buyer within the time specified in his contract, or if the seller has in good faith terminated an agency indefinite in time, and the owner thereafter sells, the broker is not entitled to commission upon the sale merely because the purchaser is one whom he introduced to the owner or to the property. See also, *Edwards* v. *Cragg*, 188 Va. 564, 569, 50 S. E. (2d) 281, 283. *Cf. Realty Co.* v. *Burcum*, 129 Va. 466, 106 S. E. 375.

Here there was evidence, practically without conflict, that the plaintiffs did nothing further to interest Hilton after their initial introduction of him to the farm, not to its owner, a year before the sale was made, and the jury could conclude that they had abandoned the effort to sell to him. A permissible inference from the evidence is that whatever was done toward trying to sell the property after the expiration of plaintiffs' written contract was done by Murray and Crumpecker. Their introduction to the property was through its being shown to Murray as a prospective buyer. As stated, Gibson testified that he knew nothing of any connection between Murray and plaintiffs until a short while before the property was sold. Crumpecker testified that he made no effort to sell to Hilton and that he laid no claim to commission on the Hilton sale. During the

term of the written contract, defendant reduced his asking price by $1,000, which would have netted him $26,000, the price at which he afterwards sold to Hilton. This was done at plaintiffs' request, to aid them in an effort to sell to another prospect, but there was no evidence that plaintiffs ever advised Hilton of this reduction.

▮▮ In the second place, if it could be implied that the plaintiffs had authority to continue to show the property after their written contract expired, the jury still had a right to conclude that the authority was withdrawn before sale was made. In the latter part of June, 1947, Murray wrote the plaintiffs to see Gibson and get a price to offer a prospect of Murray's in Tennessee (not Hilton). Gibson made a price of $28,500. Ford testified that Gibson then told him that if "this man of Mr. Murray's doesn't buy it, then you can just consider that I have taken my property off the market." Murray's man did not buy. Both Murray and Crumpecker testified that Gibson told them that Ford had no more to do with his farm than they had. Murray thought that was in July, 1947, but did not recall the date; Crumpecker was uncertain when it was; Gibson testified it was in the latter part of June and before he ever met Hilton.

After the sale was made, Kiah T. Ford went to see Gibson and discussed his claim to commissions. The next day, July 19, 1947, he wrote Gibson a letter, stating, "from letters and a telegram we received from Mr. Murray, our agent, you gave us notice to discontinue bringing buyers to see your property *three weeks ago* and not two or three months, as you thought;" and further, "this man saw your property in detail with us, everything about the place, including the personal property, while our contract was in force, and as stated above, you continued to let us try to sell your farm all along, until about *three weeks ago*. Within a very short time after you gave us this notice, you sold your farm to our buyer." This notice was therefore given more than a week before Gibson ever saw Hilton

and before he ever knew that plaintiffs had shown him the property. Hence, it is quite clear that there was evidence from which the jury could conclude that if the plaintiffs had the authority they claim, it was effectively and in good faith withdrawn before Gibson saw Hilton or knew anything about his interest in the property. A contract such as the plaintiffs here assert they had may be revoked by the owner at will if the broker has not been able to comply with its terms. *Blankenship* v. *Childress*, 183 Va. 13, 17, 31 S. E. (2d) 302, 303.

Plaintiffs complain of the giving of Instructions C-3 and C-4. They were to the effect that if, after the written contract expired, Gibson verbally gave the plaintiffs a general power to sell, or they endeavored to sell with the knowledge and consent of Gibson, yet Gibson had a right to revoke that authority, and if he did so prior to learning of Hilton's renewed interest, then plaintiffs were not entitled to commissions. The objection was that they emphasized a defense which was without evidence to support it. We have pointed out above the evidence which afforded a basis for the instructions. While C-3 was sufficient to cover the point, the repetition in C-4 did the plaintiffs no harm.

We find no reversible error and the judgment is

*Affirmed.*