# Lee C. Edmonds, et al.

## v.

# Coldwell Banker Residential Real Estate Services, Inc.

Record No. 870280

March 3, 1989

Present: All the Justices

*Robert J. Zelnick (Szabo, McCarthy, Quinto, Webb & Zelnick,* on briefs), for appellants.
*John M. Braswell* for appellee.

WHITING, J., delivered the opinion of the Court.

In this case, we decide whether a real estate broker may continue to negotiate with a prospective purchaser after the listing period has expired but during an additional period in which the broker's commission is to be paid if the property is sold to a prospect with whom the broker negotiated during the listing period. Because the broker prevailed in the trial court, we view the evidence and all reasonable inferences in the light most favorable to it. *Litchford* v. *Hancock*, 232 Va. 496, 497, 352 S.E.2d 335, 336 (1987).

On November 8, 1984, Lee C. Edmonds and Ruth C. Edmonds listed their 31.7-acre tract of land for sale with Bill Money, an agent of Coldwell Banker Residential Real Estate Services, Inc. (Coldwell Banker). The listing was for a period of six months at a sale price of $95,000.* The Edmondses agreed to pay a commission of $6,650 to Coldwell Banker if the property was sold

---

* Although they showed the sale price as $95,000, the parties agreed that the 31.7-acre tract was to be sold for $3,000 an acre, which would make the sale price $95,100.

by you, me, us or anyone else, or if anyone produces a purchaser ready, willing and able to purchase the property. Such compensation shall [also] be paid if property is sold . . . within 90 days after the termination of this agreement . . . to anyone with whom the agent has negotiated or to whom the property has been shown by any person prior to . . . termination . . . .

The contract described the 90-day period as the "protection period." Because the listing period expired on May 8, 1985, the protection period ended on August 6, 1985.

Shortly after receiving the listing, Coldwell Banker posted its "for sale" sign on the property. On February 7, 1985, Clarence W. Hall, the landfill superintendent for Prince William County, called Mike Whiley, an agent of Coldwell Banker, inquiring about the availability of the land. Hall followed up his telephone call with a letter dated March 15, 1985, in which he expressed an interest in negotiating for the purchase of the property for Prince William County. Hall, James E. Barnett, Jr., an assistant county attorney, and Whiley met on March 21, 1985, to discuss the county's interest in the property. At the meeting, Barnett told Whiley that the county could not bind itself to purchase the entire 31.7 acres because it did not have sufficient funds in its 1985 budget to pay the purchase price. Barnett, however, proposed that he and Hall would recommend that the county purchase 10 acres in 1985 and take an option on the balance over the following two years. When Money communicated this information to the Edmondses, they told him that the county's proposal was unacceptable because they did not want to sell the land in 10-acre parcels.

Nothing further was done until May 1, 1985, when Money told the Edmondses he was trying to get the county's offer in writing and asked them to extend the expiration date of the listing contract so that he "could continue on with this." The Edmondses refused to do so, and the contract expired on May 8, 1985.

On May 6, 1985, Barnett wrote Whiley notifying him that Hall "would request the County Board of Supervisors to offer Mr. Edmonds a price of $3,000 per acre for the purchase of his property . . . [but] will wish to recommend to the Board that the land be purchased in three yearly installments . . . ." The first purchase would consist of 10 acres; the optional second and third purchases,

of 10 and 10.7 acres, respectively, could be exercised over the next two years. Barnett explained that because the Constitution of Virginia prohibits a county from obligating itself to a contract extending beyond one year, Prince William County could not contract to purchase the land over a three-year period. Barnett said he would contact the agent later as to a price for the two options.

Money received Barnett's letter on May 8, 1985, and forwarded it to the Edmondses. Later, when he discussed its terms with them, the Edmondses again indicated that the county's proposal was unsatisfactory because they wanted to sell all the land at one time.

In June 1985, Money called Mrs. Edmonds and said the county would like to survey the property. Mrs. Edmonds told Money that Coldwell Banker's listing agreement had expired and the Edmondses were no longer dealing through Coldwell Banker. Mrs. Edmonds then contacted Barnett, told him the same thing, and said that if the county had any further interest in the property he should deal with them. Thereafter, Coldwell Banker did nothing further with regard to the sale of the property, except to make inquiries as to the status of any negotiations with the county.

On August 14, 1985, eight days after the 90-day protection period expired, Mrs. Edmonds wrote Barnett, referring to his letter of May 6, 1985, and subsequent telephone conversations they had had regarding the purchase of the property. She repeated the Edmondses' original offer to sell the property for $3,000 an acre, or $95,100. She also offered an alternative, giving the county the right to purchase 10 acres in 1985 for $3,000 an acre, coupled with an option to purchase the balance within a period of one year thereafter. The county was to pay $20,000 for the option and receive a credit of $15,000 upon the option payment if the balance of the land was purchased for $3,000 per acre during the option period.

On September 9, 1985, Barnett responded by indicating that Hall would recommend the Edmondses' alternate proposal to the Board of Supervisors. On October 15, 1985, however, the Board decided to purchase the entire 31.7 acres in 1985 for the $95,100 price quoted by Mrs. Edmonds, and the parties closed the sale on November 15, 1985.

Both counts of Coldwell Banker's amended motion for judgment charged a breach of contract in the Edmondses' failure to pay the agreed commission. Count One charged that Coldwell

Banker procured a purchaser ready, willing, and able to buy upon the terms set forth in the listing agreement, and that the property was conveyed to that purchaser. Count Two charged that Coldwell Banker was the procuring cause of the sale. Although the trial court found that Coldwell Banker had not produced a purchaser ready, willing, and able to buy on the Edmondses' terms during the listing period, it found that Coldwell Banker could recover its commission because it was the procuring cause of the sale. Coldwell Banker assigns no cross-error to the first ruling, but the Edmondses have appealed the second ruling.

■ According to Coldwell Banker, the evidence is sufficient to justify the trial court's finding of fact that it was the procuring cause of the sale. We have said that a real estate broker is the procuring cause of a sale when it has "originated or caused a series of events which, without break in their continuity, result in the accomplishment of the prime object of [its] employment, which is, usually, to procure a purchaser ready, willing and able to buy on the owner's terms." *Ford* v. *Gibson*, 191 Va. 96, 103, 59 S.E.2d 867, 870 (1950).

Recognizing that its efforts during the listing period were insufficient to establish Prince William County as a "purchaser ready, willing and able to buy on the [Edmondses'] terms," Coldwell Banker argues that Mrs. Edmonds breached the listing contract by interfering with its right to continue negotiations during the 90-day protection period and that this breach excused further performance by Coldwell Banker. According to it, this alleged breach enabled the trial court to find that Coldwell Banker was, in fact, the procuring cause of the sale.

■ Coldwell Banker's premise is flawed; it had no right to continue to negotiate with the county during the protection period. The listing contract, drawn by Coldwell Banker, contains no express terms permitting it to continue to negotiate during the 90-day period. In fact, that period began after "termination of this agreement."

The 90-day protection period simply gave Coldwell Banker the right to a commission if the property was sold during that time to anyone who had either seen or negotiated for the property during the listing period. We cannot read into this contract a right to continue negotiations after the agreement was terminated. *See Wilson* v. *Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398

(1984); *Virginian Ry. Co.* v. *Avis*, 124 Va. 711, 719, 98 S.E. 638, 640 (1919).

■ Therefore, we conclude that Mrs. Edmonds had the right to tell Money and the county officials that any further negotiations for the property would have to be with her, not Coldwell Banker. Mrs. Edmonds, not Coldwell Banker, arranged the terms which produced a purchaser "ready, willing, and able to buy."

■ On appeal, Coldwell Banker argues that Mrs. Edmonds was acting in bad faith in her negotiations with the county and in the timing of her letter of August 14, 1985. We will not consider that argument. Coldwell Banker not only failed to make that argument in the trial court but also conceded that the Edmondses had not been guilty of fraud, bad faith, or any "other intentional torts." On appeal, we will not note arguments not made in the trial court. Rule 5:25.

Accordingly, we will reverse the judgment of the trial court and enter final judgment for the Edmondses.

*Reversed and final judgment.*