Present:  All the Justices

SHALIMAR DEVELOPMENT, INC.

                                        OPINION BY
v.  Record No. 981365       JUSTICE LAWRENCE L. KOONTZ, JR.
                                        April 16, 1999
FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER FOR HERITAGE SAVINGS BANK


             FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Theodore J. Markow, Judge


     In this appeal, we consider whether the trial court erred

in granting a renewed motion to strike, setting aside the

greater part of a $222,000 jury verdict for the plaintiff for

defendant's breach of a real estate brokerage contract.  The

dispositive issue is whether the trial court correctly

determined that as a matter of law the plaintiff was not the

procuring cause of a particular sale and, thus, that issue was

improperly submitted to the jury.[1]

                            BACKGROUND

     Heritage Savings Bank (Heritage Savings), a federally

chartered savings bank with its principal place of business in

Richmond, acquired ownership of the Shalimar Condominiums (the

property) in Myrtle Beach, South Carolina, as the result of a

foreclosure on a "problem loan."  On July 22, 1989, Heritage

_____

     [1]A portion of the jury's award, $8,800 and interest thereon,
related to the sale of two individual units of the property in
question and is not an issue in this appeal.

Savings contracted with Shalimar Development, Inc. (Shalimar), a real estate broker, to attempt to sell the unsold units in the property. Under that contract, Shalimar was to receive at settlement a commission of "23% of the gross sales price" for each unit sold at or above specified minimum prices. Although the contract provided Shalimar with the exclusive right to sell individual units, Heritage Savings retained the right to sell the entire property. The contract further provided that either party could terminate the contract on 30-days' notice.

Shalimar successfully sold units in the property over the course of the next year and received its commissions on these sales. John Woodley Wallace, Sr. and Betty Belk Wallace (the Wallaces) negotiated with Shalimar for the purchase of two units. In the course of these negotiations, upon Shalimar's suggestion, the Wallaces indicated that they were interested in purchasing all the remaining units in the property. Accordingly, Shalimar conducted negotiations with the Wallaces and apprised Heritage Savings that a sale of all the remaining units to a single buyer was possible. Heritage Savings authorized Shalimar to negotiate a sale of the remaining units for a sales price of between 1.8 and 2.1 million dollars. The Wallaces rejected this price as "too high."

In July 1990, Heritage Savings terminated its brokerage contract with Shalimar. Over the next several months, according

2

to Anthony P. Renaldi, Heritage Savings's executive vice president in charge of real estate lending, employees of Heritage Savings had "several conversations" with the Wallaces concerning the purchase of the remaining units of the property, but no agreement was reached.

On October 11, 1990, Charles McCotter, Shalimar's principal, believing "that [Heritage Savings] had struck a deal with the Wallaces for the remaining units," caused a motion for judgment to be filed on behalf of Shalimar alleging that Heritage Savings had breached the parties' contract in that the bank had "failed and refused to pay Shalimar any of the amounts due it." Shalimar further alleged that its damages were "not less than $150,000," but did not otherwise give specific details of the alleged sales upon which it asserted it was due a commission.

On October 19, 1990, the Office of Thrift Supervision, pursuant to federal law, placed Heritage Savings in receivership and appointed the Resolution Trust Corporation (RTC) as receiver. On that same day, the Office of Thrift Supervision chartered a new bank, Heritage Federal Savings Bank (Heritage Federal), placed this bank in conservatorship, and appointed RTC as conservator. As a result, Heritage Federal assumed the operations of Heritage Savings. Still on the same day, the

3

property in question was conveyed from Heritage Savings to Heritage Federal.

Thereafter RTC, as conservator of Heritage Federal, resumed negotiations with the Wallaces and ultimately reached an agreement in April 1991 to sell the remaining units in the property to them for $1,010,000. By deed dated May 9, 1991 and recorded May 15, 1991, Heritage Federal conveyed the property to the Wallaces.

RTC, as receiver for Heritage Savings, filed an answer to the October 11, 1990 motion for judgment denying any liability to Shalimar. After a lengthy period of discovery, a jury trial commenced in the trial court on February 9, 1998. The Federal Deposit Insurance Corporation (FDIC) assumed the defense of the suit as successor to RTC. In addition to evidence in accord with the above recounted facts, FDIC adduced testimony from Mr. Wallace and his attorney, directly contradicting Shalimar's evidence, that the first discussions concerning buying the remaining units were initiated by Heritage Savings sometime after Shalimar ceased to market the property. The Wallaces' attorney testified that the first mention in his records of the sale of the remaining units to his clients was in a December 3, 1990 telephone conference.

At the conclusion of all the evidence, the trial court took FDIC's motion to strike under advisement and the case was

submitted to the jury.  The trial court instructed the jury that "[i]n order for Shalimar Development to have been the procuring cause of the sale, it must have been responsible for causing a series of events which, without break in their continuity, resulted in completing the sale."  The jury returned its verdict for Shalimar, awarding $222,000 in damages.  FDIC made a motion to set aside the jury verdict, and the trial court took the motion under advisement, directing the parties to file briefs.

In an order dated April 8, 1998, the trial court sustained the motion to set aside the jury verdict, finding that

> the evidence [was] insufficient to establish that Shalimar was the actual "procuring cause" of the April 1991 transaction.  Due to the pricing impasse, the termination of [Shalimar's brokerage] contract, and the receivership, it was erroneous to submit the issue to the jury as reasonable people could not find this series of events to be continuous.  The facts of [Shalimar's] original brokerage role and introduction of the Wallaces to the property are insufficient to sustain its entitlement to a commission in light of the break in the continuous series of events leading up to the sale.

We awarded Shalimar this appeal.  We also granted FDIC's assignment of cross-error asserting that Shalimar's recovery should be limited to the amount claimed in its ad damnum.

## DISCUSSION

We apply a well-settled standard of review to cases where the trial court has set aside a jury verdict.  As we explained in Lane v. Scott, 220 Va. 578, 260 S.E.2d 238 (1979), cert.

5

denied, 446 U.S. 986 (1980), the trial court's authority to set aside a jury verdict

> can only be exercised where the verdict is plainly wrong or without credible evidence to support it.  If there is a conflict in the testimony on a material point, or if reasonable [persons] may differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, the trial judge cannot substitute his conclusion for that of the jury merely because he would have voted for a different verdict if he had been on the jury.

Id. at 581, 260 S.E.2d at 240 (citation omitted).  Further, in considering the evidence, we give the recipient of the verdict the benefit of all substantial conflicts in the evidence and all reasonable inferences that may be drawn from the evidence.  Henderson v. Gay, 245 Va. 478, 481, 429 S.E.2d 14, 16 (1993); Fobbs v. Webb Building Ltd. Partnership, 232 Va. 227, 230, 349 S.E.2d 355, 357 (1986); T.M. Graves Const., Inc. v. Nat'l Cellulose Corp., 226 Va. 164, 169-70, 306 S.E.2d 898, 901 (1983).

With regard to the dispositive issue in this case, "[w]e have said that a real estate broker is the procuring cause of a sale when it has 'originated or caused a series of events which, without break in their continuity, result in the accomplishment of the prime object of [its] employment, which is, usually, to procure a purchaser ready, willing and able to buy on the owner's terms.'"  Edmonds v. Coldwell Banker Residential Real

6

Estate Services, Inc., 237 Va. 428, 432, 377 S.E.2d 443, 445 (1989) (quoting Ford v. Gibson, 191 Va. 96, 103, 59 S.E.2d 867, 870 (1950)).  Thus, under a "general contract" of employment, as distinguished from a "special contract," the broker is entitled to its commission from the owner when the broker produces a purchaser ready, willing, and able to buy the property on the owner's terms regardless of whether the sale is ultimately consummated.  See Kuga v. Chang, 241 Va. 179, 182-83, 399 S.E.2d 816, 818 (1991); Kingsland Land Corp. v. Lange, 191 Va. 256, 261, 60 S.E.2d 872, 874 (1950).  In contrast, a special contract imposes conditions upon the broker's right to a commission; for example, "that the commission shall be payable only when the purchase price has been received, or when the contract for the purchase has been executed."  Parker v. West, 191 Va. 710, 714, 62 S.E.2d 862, 864 (1951).

FDIC contends that Shalimar's contract with Heritage Savings was a special contract.  Because there was no sale by Heritage Savings at the time Heritage Savings failed and RTC was appointed as receiver on October 19, 1990, FDIC further contends that Shalimar could not have been entitled to a sales commission at that time and, thus, under 12 U.S.C. § 1821(e)(3), no liability for any subsequent commission on a future completed sale could accrue to RTC, Heritage Federal, or, ultimately, FDIC.

We need not determine whether the contract between the parties in this case was a general or special contract; nor is it necessary that we address the federal regulations implicated by the facts of this case. The trial court determined that "the break in the continuous series of events leading up to the sale" precluded the jury from finding that Shalimar was the procuring cause of the sale of the property by Heritage Federal to the Wallaces. Accordingly, we will sustain the trial court's determination that Shalimar did not procure "a purchaser ready, willing and able to buy on the owner's terms" if the record supports the conclusion that reasonable persons may not differ on that factual issue, causing the jury verdict to be plainly wrong as a matter of law.

Even viewing the evidence and all reasonable inferences therefrom in the light most favorable to Shalimar, it is apparent that the Wallaces were not "ready, willing and able to buy on the owner's terms" on October 19, 1990. The Wallaces at that time had rejected Heritage Saving's sales price and, thus, were clearly not willing to buy the property on the owner's terms. In addition, Renaldi, the former Heritage Savings employee who testified for Shalimar, was certain in his testimony that no agreement had been reached with the Wallaces prior to the failure of Heritage Savings.

8

Thereafter, there is no dispute that Heritage Savings did not sell the property to the Wallaces, but transferred it to Heritage Federal pursuant to the applicable federal regulations. Moreover, the ultimate sale of the property was from Heritage Federal to the Wallaces for a sales price significantly below the price Heritage Savings had been willing to accept. That contract was not entered into until six months after Heritage Savings failed, and there were clearly intervening negotiations between Heritage Federal and the Wallaces.

In short, although the record supports Shalimar's claim that it negotiated with the Wallaces for the sale of the remaining units in the property, there is simply no evidence that these negotiations resulted in or facilitated the ultimate sale of the property to the Wallaces. While Heritage Federal may have benefited from the knowledge that the Wallaces had considered and rejected Heritage Savings' prior offer, there was simply insufficient continuity between Shalimar's negotiations and the ultimate sale to warrant a finding by the jury that Shalimar was the procuring cause of that sale. "[T]he broker is not entitled to commission upon the sale merely because the purchaser is one whom he introduced . . . to the property." Ford, 191 Va. 104, 59 S.E.2d at 870.

9

For these reasons, we will affirm the judgment of the trial court.[2]

<u>Affirmed</u>.

---

[2]Our resolution of the main issue in this appeal renders moot the cross-error assigned by FDIC.  Accordingly, we express no opinion on that issue.