Present: Hassell, C.J., Lacy, Keenan, Koontz, Lemons, Agee, JJ.,
and Carrico, S.J.

JOHN R. DOHERTY
                                        OPINION BY
v.  Record No. 060959         SENIOR JUSTICE HARRY L. CARRICO
                                         March 2, 2007
DEBRA J. ALECK, D.P.M., ET AL.

          FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
                       James A. Cales, Jr., Judge


                             BACKGROUND

     In this medical malpractice case, the plaintiff, John R.

Doherty, filed a motion for judgment against the defendants,

Debra J. Aleck, D.P.M., and Podiatry, Ltd., a limited liability

company wholly owned by Dr. Aleck.  In his motion for judgment,

Doherty alleged that Dr. Aleck was negligent, inter alia, in

failing to "refrain from contraindicated surgeries," resulting

in the amputation of the great toe on Doherty's left foot.

     A jury returned a verdict in favor of Doherty in the amount

of $850,000.00.  The defendants moved to set aside the verdict

on the grounds Doherty's medical expert, Dr. Noel P. Patel, had

failed to testify to a reasonable degree of medical probability

that Dr. Aleck breached the standard of care and that the

alleged breach proximately caused Doherty's injuries.  The trial

court granted the motion, set the verdict aside, and entered

final judgment in favor of the defendants.  We awarded Doherty

this appeal.

STANDARD OF REVIEW

In determining whether the verdict was properly set aside, we are guided by a well-settled standard of review. Under Code § 8.01-680, a trial court is empowered to set aside a verdict in a civil action on the ground it is "plainly wrong or without evidence to support it." However, as we explained in Lane v. Scott, 220 Va. 578, 260 S.E.2d 238 (1979):

> "[This power] can only be exercised where the verdict is plainly wrong or without credible evidence to support it. If there is a conflict in the testimony on a material point, or if reasonable [persons] may differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, the trial judge cannot substitute his conclusion for that of the jury merely because he would have voted for a different verdict if he had been on the jury."

Id. at 581, 260 S.E.2d at 240 (quoting Commonwealth v. McNeely, 204 Va. 218, 222, 129 S.E.2d 687, 689-90 (1963)). Further, "in considering the evidence, we give the recipient of the verdict the benefit of all substantial conflicts in the evidence and all reasonable inferences that may be drawn from the evidence." Shalimar Dev., Inc. v. Federal Deposit Ins. Corp., 257 Va. 565, 570, 515 S.E.2d 120, 123 (1999).

THE FACTS

The record shows that Doherty came under Dr. Aleck's care in April of 2000 for a callous on the side of the great toe on his left foot. At the time, Doherty was 74 years of age and suffering from diabetes and diabetic neuropathy with a history

of quintuple bypass surgery and the installation of a pacemaker one year earlier, as well as colon cancer and prostate cancer several years earlier.  In her 11 years of practice, Dr. Aleck had seen only two other patients who had undergone quintuple bypass surgery.

Dr. Aleck began a course of treatment of Doherty's callous, which included periodically shaving the callous and having the plaintiff wear a shoe that, he said, did not relieve the pain in his toe and got his "back out of whack."  The shaving process continued for about ten months to the point where the process caused the callous to bleed and create a hole in the callous.

By February of 2001, Doherty had developed a neuropathic ulcer in the same area as the callous, and his toe became red and swollen.  He made an appointment with Dr. Aleck, who noticed there was a "brewing infection underneath the skin."  She "cut it, drain[ed] it, cultured it," and put Doherty "on an antibiotic right away."

Nine months later, x-rays revealed a bone spur on Doherty's left great toe "that was causing it . . . not to heal."  On December 5, 2001, Dr. Aleck performed surgery in her office and removed the bone spur, and it is this surgery that is the subject of the present controversy.  Doherty returned home the same day with his foot completely bandaged.

On a follow-up visit five days later, Dr. Aleck removed the bandage, examined Doherty's toe, and indicated everything was "fine." Two days later, Doherty's wife called Dr. Aleck's office because Doherty was in such pain that he was crying and his toe was hot and red. Mrs. Doherty was only able to reach Dr. Aleck's assistant, who told her to increase the pain medication, which she did. In a second conversation the same day, the assistant told Mrs. Doherty that "they had done . . . extensive surgery on the foot."

Early on the morning of December 12, Mrs. Doherty called Dr. Aleck's office again, this time in tears, because her husband was "hurting so bad" and she "could smell something but [she] didn't know what it was." She asked to speak to the doctor, but was only allowed to talk to the assistant. About six o'clock that evening, Dr. Aleck called Mrs. Doherty, who told the doctor what she had reported to the assistant earlier in the day. Dr. Aleck told Mrs. Doherty to "bring [Doherty] in first thing in the morning." Mrs. Doherty asked where Dr. Aleck was, and when she was told the doctor was in the office, Mrs. Doherty said she was "bringing him tonight." Mrs. Doherty borrowed a wheelchair from a neighbor, put her husband in a car, and drove him to Dr. Aleck's office.

Dr. Aleck examined Doherty's toe and found it malodorous, blackish in color, and with hemorrhagic drainage. "The minute

4

[Dr. Aleck] saw [the toe]," she knew it "was a serious condition."  As a podiatrist, she could only co-admit patients to a hospital, and she had to call several other doctors before she could arrange for Doherty's admission.  Mrs. Doherty and other family members who had come to Dr. Aleck's office took Doherty to the emergency room at Maryview Hospital.  Doherty was admitted to the hospital, and the next morning was examined by Dr. Elias J. Arbid, a vascular surgeon, who found Doherty suffering from "gangrene with a necrotizing infection" with "no way to salvage the toe."  Dr. Arbid then amputated the toe.

ANALYSIS

On appeal, the defendants argue that the trial court was correct in setting aside the jury verdict because, as they argued in their motion to set aside the verdict, Doherty's expert witness, Dr. Patel, did not testify to a reasonable degree of medical probability that Dr. Aleck breached the standard of care and that the alleged breach proximately caused Doherty's injuries.  As Doherty points out, we have held that this argument is properly considered a challenge to the admissibility of the evidence, not a challenge to the sufficiency of the evidence.  Bitar v. Rahman, 272 Va. 130, 139, 630 S.E.2d 319, 324 (2006).  Such a challenge must be raised when the evidence is presented and, as Bitar explains, comes too late "if the objecting party remains silent during its

5

presentation and brings the matter to the court's attention by a motion to strike made after the opposing party has rested."  Id. In this case, the defendants did not object to the admission of Dr. Patel's testimony and, thus, the defendants' argument challenging the adequacy of Patel's testimony on the ground it was not to a reasonable degree of medical probability was not timely made.  Therefore, the trial court should not have considered this argument in deciding whether there was sufficient evidence to sustain the jury verdict and we will not consider it here.*

The question in this case is not whether Dr. Aleck was negligent in the way she performed the spur-removal surgery on Doherty's toe on December 5, 2001, but whether she was negligent in performing the surgery at all.  Our consideration of the issue of breach of the standard of care, therefore, will focus upon whether, as Doherty's motion for judgment charged, the surgery was "contraindicated."

---

* The defendants say we should not consider Doherty's argument concerning their failure to make a contemporaneous objection because Doherty's petition for appeal contained no assignment of error relating to that failure.  However, assignments of error are supposed to "list the specific errors in the rulings below upon which the appellant intends to rely," Rule 5:17(c), meaning errors of a court in a given case, not errors of a party in the handling of the case.  Furthermore, Doherty assigned error to the trial court's action in setting aside the verdict, and the defendants' failure to make a contemporaneous objection relates to that assignment because the failure to object directly

6

BREACH

Dr. Patel, Doherty's medical expert, testified that, given Doherty's medical history, Doherty was "a poor candidate" for the surgery Dr. Aleck performed on December 5, 2001, and that the surgery "was not medically necessary at the time." Dr. Patel said that "[t]his is not an emergency procedure, this is more elective"; Doherty was more at risk of infection, gangrene, and amputation than one not suffering from similar conditions; and "the standard of care . . . with respect to doing surgery" would require one to "be very reserved and conservative and certainly not trying . . . to complicate matters more."

Dr. Patel also stated that "[a]fter reviewing the records of Dr. Aleck and the other consultants," it was his opinion "Mr. Doherty was a poor choice for this elective procedure" and he "could have been treated conservatively." There was "a good chance," Dr. Patel said, "that Mr. Doherty probably would have healed eventually with the conservative care," and when asked on cross-examination "[h]ow much longer would [he] have gone on . . . with a patient like Mr. Doherty," Dr. Patel replied, "[a]s long as it takes to keep that patient ambulatory, to keep that toe alive."

---

affects the quality of the evidence that must be evaluated in determining whether the verdict was property set aside.

Dr. Patel was also asked on cross-examination whether he understood "there may be a difference between what [he] would do individually and what the standard of care in the abstract would require." The doctor replied, "I think it's prudent for the physician to make that decision from the standpoint of what a normal practicing physician would do under those circumstances, and my personal opinion is that [Dr. Aleck] did not do what a normal practicing physician would do under those circumstances. So therefore, she did breach the standard of care."

When asked on cross-examination whether it "would be fair to say" that "just because someone's a poor candidate doesn't mean it's a breach of the standard of care for a doctor to address the problem surgically," Dr. Patel replied, "there's something called common sense. I think as a physician you have to make that decision for the patient. You have to protect the patient's best interest." When pressed with the same question, the doctor stated: "The standard of care, in my opinion, would be to breach from the norm, and as far as I'm concerned, this is a breach from the norm." And, although Dr. Patel agreed while on cross-examination that "whether to do surgery" was a matter of "[p]rofessional judgment," he stated on redirect that Dr. Aleck's surgery on Doherty "certainly was poor judgment."

As noted previously, the question in this case is not whether Dr. Aleck was negligent in the way she performed the

8

spur-removal surgery on December 5, 2001, but whether she was negligent in performing the surgery at all. The defendants were quite successful in getting Dr. Patel to agree there was nothing negligent about the way Dr. Aleck performed the surgery, but, again, the defendants have missed the point. We are of opinion that Dr. Patel's testimony as supplemented by the medical records was clearly sufficient to make a jury issue of whether Dr. Aleck was negligent in performing the surgery at all.

CAUSATION

" 'The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred.' " Jenkins v. Payne, 251 Va. 122, 128, 465 S.E.2d 795, 799 (1996) (quoting Beale v. Jones, 210 Va. 519, 522, 171 S.E.2d 851, 853 (1970)). "There may be more than one proximate cause of an event." Jenkins, 251 Va. at 128, 465 S.E.2d at 799. Thus, the question is whether the surgery Dr. Aleck performed on Doherty on December 5, 2001, was a proximate cause of the amputation of his toe.

In addition to the evidence concerning Doherty's age and the pre-surgery debilitating condition of his health, the record shows a continuous sequence of events commencing with the surgery on December 5, 2001, followed only eight days later by the amputation of his toe on December 13. Dr. Patel testified

9

that Dr. Aleck had used a tourniquet on Doherty's toe during the surgery, which he said was an accepted procedure, but "when you release that tourniquet, you get a flow of blood especially into that area," and "that can lead to a more complicated condition where he has ischemia"; "[i]schemia is a lack of blood flow to the area," and the "number one cause of [gangrene developing in Mr. Doherty's situation] is ischemia, lack of blood flow to the area." And from his "reading of the notes," Dr. Patel concluded "it was gangrene" that was "the reason for the amputation."

The defendants assert, however, that Dr. Patel "undermined his already weak testimony regarding proximate cause when he admitted that Mr. Doherty may have undergone an amputation even absent Dr. Aleck's surgery." The defendants point out that Dr. Patel said there was "a possibility [Doherty] would probably go on to amputation" and that "diabetic patients can go on to develop gangrene even if a podiatrist does everything right."

We disagree with the defendants' characterization of the strength of Dr. Patel's testimony. But, if Doherty's proof of causation was lacking in some respect, the deficiency was removed by the testimony of two of the defendants' own witnesses. The defendants' medical expert, Dr. Laurence Rubin, testified on direct examination that Doherty had a post-operative infection, rather than ischemia, and that "[m]other nature" caused the infection. However, when asked on cross-

10

examination "[d]oes mother nature cut off circulation like a tourniquet . . . [p]ostoperatively," his answer was, "[p]ostoperatively, no." And, Dr. Arbid, who amputated Doherty's toe and who testified for the defendants, supplied the clincher. He was asked "[w]hether anything [Dr. Aleck] did caused Mr. Doherty to need a great toe amputation." The doctor replied, "I'd like for you to clarify that, because <u>clearly that occurred as a result of a previous procedure she had performed</u>." (Emphasis added.)

Finally, with regard to Dr. Patel's testimony that there was "a <u>possibility</u> [Doherty] would probably go on to amputation" (emphasis added), the law in this area deals in probabilities and not possibilities. <u>Fairfax Hosp. System, Inc. v. Curtis</u>, 249 Va. 531, 535, 457 S.E.2d 66, 69 (1995). Furthermore, anyone who reads the record in this case should come away convinced that, with a patient in the stressful situation in which Doherty found himself, it was probable that, but for Dr. Aleck's surgery, Doherty would not have suffered the amputation of his toe. We are of opinion, therefore, that the evidence was clearly sufficient to make a jury issue of whether the surgery Dr. Aleck performed on Doherty was a proximate cause of the amputation of his toe.

Accordingly, we hold that the jury's verdict was supported by credible evidence, and we will reverse the judgment of the

11

trial court, reinstate the jury verdict, and enter final judgment in favor of Doherty.

<u>Reversed and final judgment</u>.
