PUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Beales and Huff
Argued at Salem, Virginia


RICHARD C. WAGONER, JR.

                                                        OPINION BY
v.        Record No. 2233-12-3                  JUDGE ROBERT J. HUMPHREYS
                                                        APRIL 8, 2014
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF MARTINSVILLE
G. Carter Greer, Judge

James R. McGarry (James W. Haskins; David O. Williamson;
Young, Haskins, Mann, Gregory, McGarry & Wall, P.C.; Brumberg,
Mackey and Wall, P.L.C., on briefs), for appellant.

Alice T. Armstrong, Senior Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Richard C. Wagoner, Jr. ("Wagoner") was convicted by a jury in the Circuit Court of the

City of Martinsville ("trial court") of abuse or neglect of an incapacitated adult resulting in death,

in violation of Code § 18.2-369(B).  On appeal, Wagoner argues (1) that the trial court applied

the wrong decisional standard in denying his motion to set aside the jury verdict; (2) that the

evidence was insufficient to support a finding that his conduct was a proximate cause of the

victim's death; and (3) that the evidence was insufficient to establish that he committed a willful

act with knowledge and consciousness that injury or death would result to the victim.  For the

following reasons, we affirm the trial court.

## I.  BACKGROUND

On appeal, we "consider the evidence and all reasonable inferences fairly deducible

therefrom in the light most favorable to the Commonwealth, the prevailing party at trial."  Bass

v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000).

In February 2011, Joe Tuggle ("Tuggle"), the victim, was living in a group home for men with intellectual disabilities run by the Claye Corporation. Wagoner, who holds a PhD in applied developmental psychology, owns the Claye Corporation and serves as the president of the Corporation. The Claye Corporation has a provider agreement with the Department of Developmental Health to provide services to intellectually disabled adults. The Claye Corporation operates several homes where clients reside. Three clients, including Tuggle, lived in the Minor Street home ("Minor Street").

In February 2011, Tuggle was fifty-seven years old and had severe Parkinson's disease and Lewy bodies in his brain causing dementia. It is unclear what caused Tuggle's intellectual disabilities, but whatever the cause, he was unable to communicate effectively, he could not carry on a real conversation, and he mostly moaned and gestured. Tuggle also needed help with eating and with personal care. Tuggle could walk, but he was shaky from the Parkinson's disease and had trouble with walking and standing on his own.

Around seven in the evening on February 8, 2011, Tuggle was sitting on a couch in the Minor Street living room when he had a diarrhea accident. Jerome Baker ("Baker"), who was working on staff, assisted Tuggle to the restroom and sat Tuggle on the toilet. After waiting with Tuggle two to three minutes, Baker left to retrieve a mop bucket and cleaning supplies from the kitchen and began helping another staff member, Kenny L. Brown ("Kenny L."), clean up the diarrhea that was on the couch and floor in the living room. After cleaning for five or six minutes, Baker returned to the restroom and found Tuggle lying down in the bathtub on his back with only hot water running out of the shower. Tuggle was saying "Help me! Help me!" Baker turned off the hot water and yelled for Kenny L. to come help. Baker and Kenny L. grabbed Tuggle and raised him up and sat him on the toilet. They dried Tuggle off and noticed his skin was very red. Then they took Tuggle to the living room and noted again that his skin was really

red and it started to peel about ten minutes later. Baker testified that he grabbed the phone, ready to call 911, but Kenny L. told him "No," and to call their supervisor first because that was the policy.

Kenny L. called Kenny A. Brown ("Kenny A."), the staff supervisor that night. Kenny A. left his home and went to Minor Street around 8:30 p.m. Kenny A. inspected Tuggle and determined that Tuggle did not need medical attention. Kenny A. called Tameki Tarpley ("Tarpley"), his co-supervisor,[1] to inform her of Tuggle's accident. Without seeing Tuggle, Tarpley called the emergency room ("E.R.") on February 8 and asked how to treat a burn that "appeared to be like a sunburn." Tarpley testified, "All they could tell me was we could apply cold compressions and go to the pharmacy, [and] ask the pharmacist how to treat it."[2] Tarpley called Kenny A. back and said to apply cold rags to Tuggle's burns. Kenny L. and Baker stayed with Tuggle until 11:00 p.m. applying cold rags, and Baker testified that Tuggle made noises indicating he was in pain.

The next morning, February 9, Kenny A. arrived back at Minor Street around 6:30 a.m. He got there earlier than usual in order to check on Tuggle. He observed that Tuggle looked different that morning and that his burns were "a little bit redder than they were pink" and this concerned him. Kenny A. called Tarpley and told her that they needed to take Tuggle to the hospital to be checked out. Tarpley was on her way to work, a little before 7:00 a.m., when she called staff member Lacoma Hairston ("Hairston") to bring one of the company vans over to

---

[1] Tarpley and Kenny A. supervised the Minor Street staff members, who provided most of the direct care to the residents.

[2] Tarpley's phone records indicate that she called Martinsville Memorial Hospital at 9:29 p.m. on the night that Tuggle was burned, and her call lasted 54 seconds. The charge nurse working in the E.R. on the night of February 8 testified that the E.R. does take calls from the general public but the policy is that the employees are not allowed to give any medical advice over the telephone. The nurse did not recall any calls regarding burn injuries on February 8, and testified that doctors do not answer the phones.

Minor Street to transport Tuggle to the hospital. Tarpley then arrived at Minor Street and saw Tuggle's arm and neck and confirmed that it was red. Cynthia Epley ("Epley"), a director at the Claye Corporation,[3] called Tarpley prior to arriving at Minor Street and Tarpley told her about Tuggle's accident the night before and that he was burned. Tarpley also told Epley that a van was coming to transport Tuggle to the E.R.

Hairston arrived at Minor Street with the van about 7:15 a.m. Some staff members put Tuggle in the van, and the van left. Epley testified that she called Wagoner after speaking with Tarpley and that Wagoner said, "Well, I'd like to see him before he goes." Epley then called Tarpley to tell her that "Mr. Wagoner would like to see [Tuggle] before he goes." Tarpley then called Hairston and told her to bring the van back. The van arrived back at Minor Street within a short time, about three minutes after Tarpley called Hairston.

After the van returned, Tarpley went to CVS "because that's what the hospital [told her to do]" and she asked the pharmacist how to treat a sunburn. The pharmacist told her to use drainage strips, "cold compresses to keep it clean and to dry the heat," and Neosporin. According to her CVS receipt, Tarpley purchased the recommended supplies at 8:01 a.m., and then she returned to Minor Street.

Epley arrived at Minor Street around the same time that Tarpley returned from CVS. When Epley entered the house, Tuggle was sitting in the living room in a wheelchair. Tuggle had something over him so she could only see the top of his hand. Wagoner arrived shortly after Epley, and the staff started explaining to them what had happened. Epley described the scene as chaotic and overwhelming, and everyone was talking at once. She stayed inside the Minor Street house less than ten minutes and then went to sit in her car. Wagoner asked Tuggle how he was

---

[3] Wagoner was Epley's boss, and Epley oversaw the supervisors at Minor Street and other Claye Corporation homes. Epley was indicted by the Commonwealth but the charge was *nolle prosequied*.

- 4 -

doing. Then Baker took the sheet off of Tuggle and pulled up Tuggle's T-shirt for Wagoner to see his injuries. Baker testified that Tuggle's skin was really red and skin had peeled away. Staff member Lawrence Collins ("Collins") testified that Tuggle did not have any clothes on and that he and staff member Artis Williams stood Tuggle up and dropped the sheet from him so Wagoner could have a look. "[Wagoner] looked at him. He looked him up and down. Then he just looked. We sat [Tuggle] back in the chair. [Wagoner] looked at everybody. He didn't say one word to us. He just looked, this look he had. He walked out." Epley testified that on February 9, the staff made the treatment decision to send Tuggle to the hospital and that Wagoner made the treatment decision with regard to not sending Tuggle to the hospital.

Collins described that he was "in shock" when he walked in the home that morning and saw Tuggle because Tuggle "had suffered a very bad burn." Collins elaborated on Tuggle's condition that morning: Tuggle looked like he was hurting; he was just staring; he was not smiling or talking. "Tuggle didn't have no flesh on him from the back of his head, like all of his hair was melted and stuff to him, all down his shoulders. His butt was gone. All the way down, you know, he had burns all the way down to his feet." Collins continued,

> He couldn't have nothing on him. You know, not even underwear.
> He was just that much in the raw. His whole body was like just
> real pink. It looked like it had just happened. I mean it was just
> like somebody just took all the skin off the back of him. He didn't
> have none. I mean like Tuggle was real hairy. He didn't have no
> hair on his back no more, or on his butt, nowhere.

After looking at Tuggle for two or three minutes, Wagoner went outside and sat with Epley in her car. According to Wagoner, Epley was upset and nervous and had to take her blood pressure medication while they talked in the car. While Collins smoked a cigarette outside, he watched Epley and Wagoner in the car. Wagoner looked upset and agitated, and based on his hand-gestures, Collins could tell Wagoner was not happy. Epley testified that when Wagoner got in the car he said his nerves were "just shot," and "Well, I guess Social Services will

- 5 -

investigate us." He also told Epley that "after talking to Tuggle and talking to Ms. Tarpley and hearing what the hospital had to say, he decided that we would treat Tuggle at home one on one, with one on one care, that he felt he'd get better care." Wagoner left Minor Street after talking with Epley for about ten minutes.

After Wagoner left, Epley telephoned Tarpley to come out to her car. They went to Family Pharmacy together and Epley picked up her own medication and Tarpley bought more Neosporin and Tylenol. Epley told Tarpley that if Tuggle gets worse they should take him to the E.R. After Epley dropped Tarpley off at Minor Street, Epley left and went to a friend's house for the afternoon. From there she made two phone calls to Wagoner during which they discussed reporting the burn incident to "licensure," meaning the Department of Behavioral Health and Developmental Services, Office of Licensing.[4] Epley stressed to Wagoner that he did need to report Tuggle's injuries to licensure. Wagoner told Epley he did not know if Tuggle's injury met the criteria for reporting and he would have to check into it. Wagoner indicated that he did not think Tuggle's injuries needed to be reported because there was no blood present.

Tarpley and Kenny A. supervised the staff's care of Tuggle over the next nine days. The staff applied Neosporin and cold rags to Tuggle's burns. The staff changed Tuggle's sheets and T-shirts often because the burns were oozing and they were wet and smelled bad. Sometimes there was blood on the sheets, too. Tuggle's burn wounds turned yellow, pus came out of them, and they started to stink. Collins, who refused to care for Tuggle because he did not feel qualified to care for burn injuries, reported that the odor in Tuggle's room was so bad after three or four days that it made him want to vomit. Other staff members mentioned the odor, too.

---

[4] Epley testified that Wagoner's job is purely administrative and business and that she oversees client care. The practice was for Epley to report injuries to Wagoner and he was responsible for reporting injuries to the regulatory agencies, including the licensing agency within 24 hours.

Tuggle had to be turned each hour to be on his right side or left side. Collins said, "It was bad," and he was "just in awe of the whole thing." Baker, who took care of Tuggle most days between his accident and his death, testified that Tuggle slowed down in movement and would not eat as much. The staff wiped Tuggle very carefully during sponge baths because they could not put any pressure on him.

Baker made routine notes during his shifts that Tuggle "laughed and smiled" as staff put ointment on him; he also wrote, "no problems to report," and "Tuggle ate all of his dinner." Other notes indicated that Tuggle "relaxed" and watched television. Collins testified that all the notes said "nothing to report" because management would not allow reports otherwise. He added that Tarpley and Kenny A. would tell the staff how to write the notes and the staff did not report anything because the management already knew Tuggle's condition. Defense counsel also pointed out that neither Baker nor Collins called 911 and they did not call Wagoner to say that Tuggle needed more care. Baker understood that the supervisor should be consulted instead of 911 and that the decision about Tuggle's care had already been made—it was understood that "he's not going anywhere."

Adrian Jones took care of Tuggle only one day after Tuggle's burns. When Jones saw Tuggle on February 13 he was shocked to see Tuggle's injuries. Jones observed that Tuggle looked like he was in a lot of pain, and was "burnt real bad, purple, red all over, down from his ankles up to his head. His hair was melted to his head." Tuggle had blisters on his side, his back, and his buttocks, and pus was running off his body. Tuggle's room smelled like death. Jones added, "I was sitting beside him and I was the only one to see that tears shed[] from his face." Tuggle was wrapped in sheets without clothes underneath. Tuggle's sheets had to be changed every 30 minutes, and "[w]hen we'd pull them off, the skin would be pulling with it so

you'd be pulling skin with the sheets every time we'd change them." Jones wrote "no incidents to report" for his shift because Tuggle's injury did not occur on his shift.

In the days following Tuggle's accident, Wagoner did not visit Minor Street and apparently only relied on the supervisors to report on Tuggle. Wagoner had no burn training, and he knew that the supervisors did not have any burn training. The staff members were only trained in first aid and CPR. Wagoner later told a case investigator that the decision to take care of Tuggle at Minor Street "was a group decision" and that he trusted Tarpley's advice based on her call to the hospital and her conversation with a pharmacist after she asked how to treat a sunburn. He indicated that he did not think the burn was serious enough to report to licensing; he referred to Tuggle's injuries as a sunburn.

On February 15, Martinsville Police Officer Michael Clark responded to a call from the home of Curtis Williams. Curtis Williams is the father of Artis Williams, who helped care for Tuggle the next shift after Tuggle sustained his injuries, and again on February 10. Officer Clark spoke with Curtis and then spoke with Artis about a gentleman at Minor Street "who had suffered some burns." Officer Clark then visited Minor Street on a "wellness check" and was escorted to Tuggle's room where Tuggle was asleep in his bed. Tuggle's sheets were pulled back and he was not wearing any clothes; he was lying on his left side. Officer Clark observed that Tuggle had burns on his "butt area, upper thigh area. There was a burn [ ] where his right shoulder blade would have been. There was one on his right arm. I also observed one I believe on . . . the right area of his neck." Tarpley told Officer Clark that she had been "in constant contact with the emergency room" and explained how they were treating Tuggle's wounds. Officer Clark did not take any action or call emergency medical services because he believed that Tuggle was not in any imminent danger given that he appeared to be resting comfortably and was being cared for by others.

On February 16, Wagoner called Deborah Tankersley ("Tankersley"), of the Department of Behavioral Health and Developmental Services, Office of Licensing, to tell her that the police had come to Minor Street the day before to do a wellness check on Tuggle. The Office of Licensing licenses the Claye Corporation to provide services, and it monitors the services. As a provider of services, the Claye Corporation is required to report an injury that requires evaluation by a medical professional outside of the provider's location within 24 hours. Tankersley testified that Wagoner was the individual required to report injuries for the Claye Corporation, as he was listed on the license as the "person responsible for the overall management and [oversight] of the programs or the facilities that are going to be licensed." Tankersley had no prior notice of Tuggle's injury and never received an "injury report" from the Claye Corporation on the scalding incident. Wagoner told her the events of Tuggle's injury over the phone and said that "[Tuggle] got a little red where the water touched him like a sunburn." Tankersley told Wagoner that he needed to take the client to the doctor. She so advised him because Tuggle had not seen a doctor, and she took note of the fact that someone felt Tuggle's injuries were bad enough to call the police to check on him. While Wagoner told her that the E.R. said not to bring Tuggle in, she said "he needs to be seen to let somebody else make that determination."

During the week following Tuggle's burns, Tuggle's cousin, Dwayne Tuggle, called Minor Street telling of his plans to pick up Tuggle to take him to his elderly mother's house for a visit. He was told it was not a good time to get Tuggle because he had some minor burns, "like a light sunburn," and diarrhea. Dwayne and Tuggle's mother decided they would not pick up Tuggle as planned. Dwayne was not alarmed when they said Tuggle had "a light sunburn." The next time the family heard from Minor Street about Tuggle was at the time of Tuggle's death.

Around 1:30 to 2:00 a.m. on February 18, Tuggle was alive at the bed check and was assisted to the restroom. He was found unresponsive around 6:00 a.m. that morning. The staff

notified the house manager and then called 911. Wagoner notified the Office of Licensing of Tuggle's death on February 18 via facsimile.

Dr. Gayle Suzuki, the medical examiner for the case and a pathologist, performed the autopsy and determined that about thirty percent of Tuggle's body was burned and his burns were consistent with second and third degree burns. She testified that the cause of Tuggle's death was sepsis (bacteria growing in the blood) and pneumonia resulting from the thermal injuries from immersion in scalding water. She described that the sepsis bacteria was consistent with the type of bacteria found on the skin. Dr. Suzuki testified that Tuggle's pneumonia was severe. He had yellow-green pus on his lungs, and with this severe lung condition Tuggle could not have been as well off as the notes and the staff reported—it would have been nearly impossible for him to breathe.

Dr. Kevin Whaley, Assistant Chief Medical Examiner, was qualified as an expert in the field of thermal injury, including classification, diagnosis, and treatment of burns. He reviewed Dr. Suzuki's autopsy report. He testified that second and third degree burns to thirty percent of the total body surface requires automatic admission to a burn unit. A second degree burn causes the skin to wipe off and it is very painful. A third degree burn "cooks" the skin and it gets hard; it is not painful because the nerve endings are dead. The treatment for someone in Tuggle's condition would include fluid resuscitation first, then fighting the risk of infection because bacteria thrive in and under dead skin. A very strong pain medication, Fentanyl, is used to treat pain for burn patients in Tuggle's condition. Neosporin and first aid cream are definitely not recommended treatments for second and third degree burns.

After viewing photographs of Tuggle, Dr. Whaley's opinion was that Tuggle had third degree burns to his knee and buttocks, and second degree burns to his neck and cheeks, right arm, and back. He also said that Tuggle's third degree burns to his knees would have looked

yellowish-white as soon as it dried out, and it would have dried out within twelve hours after the burn, assuming no more water was applied to it. Dr. Whaley testified that Tuggle's risk of death without treatment was 100%. Initially he testified that Tuggle's risk of death *with treatment* was eighty-seven percent, based on the thirty percent burned body surface. On cross-examination defense counsel suggested a recalculation of Tuggle's burned surface area. Dr. Whaley said, "You could [ ] say 18[%]." Dr. Whaley testified that eighteen percent of the body surface burned is still going to mean 100% morality without treatment, and with treatment, Tuggle would have had a seventy-five percent chance of death and a twenty-five percent chance of survival.

Dr. Thomas Berry was received by the trial court as an expert in the diagnosis, classification, and treatment of burns, and testified for the defense. Based on his review of the autopsy, he testified that only twenty percent of Tuggle's body was burned. He also testified that Tuggle did not present symptoms of sepsis. He opined that the pneumonia onset rapidly and may or may not have been related to the burns.[5] He testified that he probably would have recommended in home/out-patient care for Tuggle.

Wagoner's counsel made a motion to strike at the close of the Commonwealth's evidence, and at the close of all the evidence. After the jury found Wagoner guilty, his counsel made a motion to set aside the jury verdict, and then a motion to reconsider the trial court's refusal to set aside the jury verdict. The trial court denied all of these motions, and entered a

---

[5] While Dr. Berry was not qualified to express an opinion as to the cause of Tuggle's death, the cited testimony is not an opinion as to cause of death and furthermore was not objected to and thus was fairly before the jury. See Wright v. Commonwealth, 23 Va. App. 1, 9, 473 S.E.2d 707, 711 (1996) ("The proper method to preclude another party from entering . . . any form of inadmissible evidence is to make a contemporaneous objection."); see also Brame v. Nolen, 139 Va. 413, 420, 124 S.E. 299, 302 (1924) ("improper evidence introduced by a party, if unobjected to by his opponent, will be considered by the appellate court as if it were proper evidence" (quoting Wessel v. Bargamin, 137 Va. 701, 712, 120 S.E. 287, 291 (1923))).

sentencing order on November 6, 2012, sentencing Wagoner to five years' incarceration with all five years suspended for a period of ten years.

## II.  ANAYLSIS

### A.  Motion to Set Aside the Jury Verdict

Wagoner's first assignment of error is that,

> The trial court erred in denying [his] Motion to Set Aside the Jury Verdict by applying the wrong decisional standard.  Although the trial court was reviewing [Wagoner]'s [m]otion after the jury had returned its verdict, the trial court erroneously applied the decisional standard intended only for guidance in deciding a motion to strike the evidence made at the conclusion of the Commonwealth's case.  In deciding [Wagoner]'s post-trial motion to set aside the jury verdict, the trial court should have reviewed the evidence under the traditional standards and jury instructions necessary to support a jury verdict.

"Today, as a century ago, 'nothing is better settled than that everything is to be presumed in favor of the correctness of the rulings of a court of competent jurisdiction, when brought under review in an appellate tribunal, until the contrary is shown.'"  Caprino v. Commonwealth, 53 Va. App. 181, 184, 670 S.E.2d 36, 38 (2008) (quoting Early v. Commonwealth, 86 Va. 921, 925, 11 S.E. 795, 797 (1890)).  "A trial court's judgment approving a jury's verdict is entitled to great weight on appeal and will not be disturbed unless it is contrary to law or plainly wrong."  Gray v. Commonwealth, 233 Va. 313, 344, 356 S.E.2d 157, 174 (1987).

In Wagoner's motion to set aside the jury verdict he argued that there was insufficient evidence for the jury to find that his acts or omissions constituted a proximate cause of Tuggle's death.  In its letter opinion, the trial court pointed to case law that supported its ruling that the Commonwealth's evidence as to proximate cause was sufficient to create a jury question:

> The language "substantial possibility of survival" should be "employed as a decisional standard for the guidance of trial courts in deciding a motion to strike the evidence," and "[i]t teaches, in short, that if a plaintiff's evidence has shown that the defendant's negligence has destroyed any substantial possibility of the patient's

- 12 -

survival, then there is sufficient evidence of proximate cause to go to the jury, and a motion to strike the evidence on that ground should be overruled."  Blondel v. Hays, 241 Va. 467, 473-74, 403 S.E.2d 340 (1991).

Wagoner takes this excerpt from Blondel out of context and argues that the trial court erroneously decided the motion to set aside the jury verdict using a "decisional standard" that should *only* be applied to motions to strike.  He asserts that the "substantial possibility of survival" standard "only applies to a trial court's analysis of a motion to strike made before a defendant presents evidence, and not to a motion to set aside a jury verdict."  The dissent agrees with this argument.

The question in Blondel, however, was whether the trial court should have instructed the jury on the "substantial possibility of survival," and the excerpt Wagoner quotes from Blondel relates to whether the jury was properly instructed.  The Supreme Court found, "The 'substantial possibility of survival' standard, while furnishing the criterion for deciding a motion to strike, was never designed for the guidance of a jury. . . . The well-settled law on the subject of proximate cause was correctly expressed by [the jury instructions] which the court granted."  Blondel, 241 Va. at 474, 403 S.E.2d at 344.  In other words, the Supreme Court approved the use of the standard as good law for a trial court to use in deciding whether there is a proper question for the jury regarding a proximate cause of death of a patient.  Id. at 473-74, 403 S.E.2d at 344.  At the same time, the Court warned against indiscriminate use of language from appellate court opinions in jury instructions.  Id. at 474, 403 S.E.2d at 344 (citing Oak Knolls Realty v. Thomas, 212 Va. 396, 397-98, 184 S.E.2d 809, 810 (1971) ("We have often said that statements appearing in opinions of this court, while authority for the propositions set forth, are not necessarily proper language for jury instructions.")).  Our Supreme Court did not make a distinction between a trial court's "decisional standard" for a motion to strike versus a motion to set aside the jury verdict, as the dissent suggests.

- 13 -

In this case, the trial court did not instruct the jury on the "substantial possibility of survival" standard. As in Blondel, the trial court here used the substantial possibility of survival standard solely to determine whether proximate cause of death was a proper question to submit to the jury. The law regarding that question is the same whether the trial court is considering a motion to strike the evidence before a jury receives the case or a motion to set aside a jury verdict. As for the trial court's standard of review when asked to set aside a jury verdict based on insufficiency of the evidence, Code § 8.01-680 provides that standard,

> When a case, civil or criminal, is tried by a jury and a party objects to the judgment or action of the court in granting or refusing to grant a new trial on a motion to set aside the verdict of a jury on the ground that it is contrary to the evidence, . . . the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it.

The trial judge's power to set aside a jury verdict

> "can only be exercised where the verdict is plainly wrong or without credible evidence to support it. If there is a conflict in the testimony on a material point, or if reasonable [persons] may differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, the trial judge cannot substitute his conclusion for that of the jury merely because he would have voted for a different verdict if he had been on the jury."

Doherty v. Aleck, 273 Va. 421, 424, 641 S.E.2d 93, 94 (2007) (quoting Lane v. Scott, 220 Va. 578, 581, 260 S.E.2d 238, 240 (1979)). Where the evidence is sufficient to make a jury issue of proximate causation, a trial court errs in setting aside the jury's verdict. Id. at 429-30, 641 S.E.2d at 97-98.

Thus, and contrary to the position taken by the dissent, when deciding how to rule on a motion to set aside the jury verdict, a trial court applies the same principles that apply to a motion to strike the evidence. "A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." Lawlor v. Commonwealth, 285 Va. 187, 223, 738 S.E.2d 847,

- 14 -

868 (2013). Where reasonable minds could differ on a factual issue, the trial court does not err in submitting the issue to the jury. Ravenwood Towers, Inc. v. Woodyard, 244 Va. 51, 59, 419 S.E.2d 627, 632 (1992). "It . . . is the function of a jury to determine the credibility of witnesses and the weight of the evidence and to resolve all conflicts in the evidence." Id. at 57, 419 S.E.2d at 630-31.

Indeed in Hadeed v. Medic-24, Ltd., 237 Va. 277, 377 S.E.2d 589 (1989), our Supreme Court expressly stated,

> "On review of a case in which the trial court has sustained a motion to strike after the introduction of all the evidence, we apply the principles governing consideration of evidence upon a motion to set aside a verdict as contrary to the evidence. '[W]e examine the evidence to determine whether or not a verdict in behalf of the losing party can be sustained. That is, upon a careful consideration of all the evidence, if we are of opinion that reasonable men may differ on the conclusion to be reached, then it is our duty to hold that the trial court committed error in striking the evidence.' In viewing the evidence we give the plaintiffs 'the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'"

Id. at 280-81, 377 S.E.2d at 590 (quoting Matney v. Cedar Land Farms, 216 Va. 932, 933-34, 224 S.E.2d 162, 163 (1976)). The Court followed this quote by stating that "[t]he standard enunciated in Matney for appellate review also is the appropriate standard to be applied at the trial level." Id. at 281, 377 S.E.2d at 590.

Therefore, we are not convinced by Wagoner's argument adopted by the dissent that there is one "decisional standard" that applies to motions to strike and a different "decisional standard" that applies to motions to set aside a jury verdict. Accordingly, we hold that the trial court did not apply an incorrect "decisional standard" in ruling on Wagoner's motion to set aside the jury verdict.

B. Proximate Cause

Wagoner's second assignment of error is that,

> The trial court erred in denying [his] Motion to Set Aside the
> [J]ury [V]erdict and in finding that [his] conduct was a proximate
> cause of Tuggle's death when the evidence showed that Tuggle
> had a 75% probability of dying from his burns, which were not
> caused by [Wagoner]. The trial court erred in allowing the jury
> verdict to stand when the evidence did not establish that Tuggle's
> death would not have occurred but for [Wagoner's] conduct, or
> even that Tuggle's death was made more probable than not
> because of [Wagoner's] conduct.

"[A] party who comes before [an appellate court] with a jury verdict approved by the trial court 'occupies the most favored position known to the law.'" Ravenwood Towers, 244 Va. at 57, 419 S.E.2d at 630 (quoting Pugsley v. Privette, 220 Va. 892, 901, 263 S.E.2d 69, 76 (1980)). "On appeal, therefore, we must view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the prevailing party at trial." Id. However, we review the trial court's application of the law to the facts *de novo*. Tuttle v. Webb, 284 Va. 319, 324, 731 S.E.2d 909, 911 (2012).

The jury convicted Wagoner of violating Code § 18.2-369(B), which reads in part, "Any responsible person who abuses or neglects an incapacitated adult in violation of this section and the abuse or neglect results in the death of the incapacitated adult is guilty of a Class 3 felony."

It is uncontested that Wagoner is a "responsible person," thus, the Commonwealth was required to prove that Wagoner's abuse or neglect of Tuggle "resulted in" the death of Tuggle. It is uncontested that Wagoner did not cause Tuggle's burn injuries. Wagoner stressed that the evidence established that Tuggle's chance of survival even with treatment was, at best, twenty-five percent, and there was no evidence that Tuggle probably would have lived with different treatment.

- 16 -

"[T]he phrase 'proximate cause' is shorthand for the policy-based judgment that not all factual causes contributing to an injury should be legally cognizable causes." CSX Transp., Inc. v. McBride, 131 S. Ct. 2630, 2642 (2011). "[T]he lack of consensus on any one definition of 'proximate cause' is manifest." Id. However, the concept of proximate cause "excludes from the scope of liability injuries that are 'too remote,' 'purely contingent,' or 'indirect[ ].'" Id. at 2645 (Roberts, C.J., dissenting) (quoting Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992)).

In this case the trial court, without objection, instructed the jury on proximate cause: "A proximate cause of a death is a cause that, in natural and continuous sequence, results in death. It is a cause without which the death would not have occurred." This jury instruction was uncontested and thus, at a minimum, is the law of the case. Owens-Illinois, Inc. v. Thomas Baker Real Estate, Ltd., 237 Va. 649, 652, 379 S.E.2d 344, 346 (1989) ("instructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review"). Therefore, the question is whether the evidence supported a finding that Wagoner's neglect of Tuggle resulted in Tuggle's death—or in other words, whether without Wagoner's neglect, Tuggle would have lived. The import of the language "results in the death" as found in Code § 18.2-369(B) is not addressed in the Code or in Virginia case law.

The United States Supreme Court has recently interpreted similar language in the federal Controlled Substances Act that "imposes a 20-year mandatory minimum sentence on a defendant who unlawfully distributes a Schedule I or II drug, when 'death or serious bodily injury *results from* the use of such substance.'" Burrage v. United States, 134 S. Ct. 881, 885 (2014) (emphasis added) (quoting 21 U.S.C. § 841(a)(1), (b)(1)(A)-(C)). Burrage sold heroin to a long-time user who injected the heroin soon thereafter and died. Id. The toxicologist determined that multiple drugs, including heroin, were present in the decedent's system at the time of his

- 17 -

death.  Id.  The toxicologist concluded that the heroin was a "contributing factor" in the decedent's death because it contributed to an overall effect that caused him to stop breathing.  Id. at 885-86.  Another doctor described the cause of death as "mixed drug intoxication" in which all drugs played a contributing role in the death.  Id. at 886.  Neither doctor could say that the decedent would have lived had he not taken the heroin.  Id. at 885-86.

The question before the Supreme Court was whether the defendant may be convicted under the "when death results" statutory provision when the use of the controlled substance was a "contributing cause" of the death.  Id. at 886.  The government was required to prove beyond a reasonable doubt that death resulted from the use of the drug.  Id. at 887.  Because the Controlled Substances Act does not define the phrase "results from," the Court looked to its ordinary meaning and found that this language imports "but for" causality.  Id. at 887-88, 890-91.  "A thing 'results' when it '[a]rise[s] as an effect, issue, or outcome *from* some action, process or design."  Id. at 887 (quoting 2 New Shorter Oxford English Dictionary 2570 (1993)).  "Results from" imposes "a requirement of actual causality."  Id.  "'In the usual course,' this requires proof 'that the harm would not have occurred in the absence of–that is, but for–the defendant's conduct.'"  Id. at 887-88 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2525 (2013)).  "This but[]for requirement is part of the common understanding of cause."  Id. at 888.  An event is the outcome or consequence of another event "when the former would not have occurred but for the latter."  Id.  "By contrast, it makes little sense to say that an event resulted from . . . some earlier action if the action merely played a nonessential contributing role in producing the event."  Id.  One instructive example of but for causation provided by the Court is as follows:  "if poison is administered to a man debilitated by multiple diseases, it is a but[]for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived."  Id.

- 18 -

We are persuaded by <u>Burrage</u> that, where the legislature has not clarified otherwise, this Court should give the phrase "results in" its ordinary meaning, which imports "but for" causation.

We note the significant role of the jury in determining whether a victim would have lived but for the abuse or neglect of the responsible person. On one extreme, we can conceive of situations in which an incapacitated adult becomes ill or injured through no fault of the responsible party and even prompt heroic measures could not have saved the victim from death. Death was certain regardless of the actions or inaction of the responsible party. Clearly, in this scenario, a responsible party's failure to act would not qualify as a cause of the victim's death. It could not be said that the ill or injured party would have or even might have lived but for the responsible party's failure to act. There is no question of fact for the jury on causation in this scenario.

At the other extreme, we can equally imagine an incapacitated adult who suffers from diabetes and receives a minor injury—a small abrasion on the foot, for example. The abrasion, if properly treated, would not be a life-threatening injury. However, the abrasion becomes infected when it is left untreated. The patient develops gangrene, which is also left untreated, and ultimately dies from medical consequences traceable initially to the small abrasion. In this scenario, the actions or inactions of any responsible person was a theoretical "but for" cause of the victim's death: the injured adult almost certainly would have lived but for the responsible party's failure to act appropriately. In this scenario, even though the legal culpability would seem to be clear, it remains a question of fact for the jury on causation.

The facts of this case fall between the two extremes posited above, and create a quintessential jury question. Dr. Suzuki testified that thirty percent of Tuggle's body was burned with second and third degree burns and that his cause of death was sepsis and pneumonia

resulting from these thermal injuries. Dr. Whaley testified that without treatment, Tuggle's risk of death was 100%. With treatment, Tuggle had a thirteen to twenty-five percent chance of survival. Dr. Berry testified that Tuggle did not appear to have sepsis, and his pneumonia onset rapidly and may or may not have been related to the burn injuries. Dr. Berry also testified that he probably would have recommended out-patient care for Tuggle.

This conflicting evidence creates a question of fact as to whether Tuggle would have lived but for Wagoner's calling Tuggle back to Minor Street from his trip to the hospital and his ongoing failure to seek professional medical treatment for him. It is the province of the jury "to weigh the facts and to judge the credibility of the various lay and expert witnesses." Commonwealth v. Presley, 256 Va. 465, 470, 507 S.E.2d 72, 75 (1998). A jury may reject a witness' testimony in part and accept it in part. Hopkins v. Commonwealth, 230 Va. 280, 293, 337 S.E.2d 264, 273 (1985). Here, the jury was entitled to believe Dr. Whaley's testimony that Tuggle had a twenty-five percent chance of survival and to conclude that Tuggle would have lived had Wagoner sought professional medical treatment for him. We find that a twenty-five percent chance of survival is sufficient to take the question of whether Tuggle would have survived absent Wagoner's neglect "out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference," thus making the question ripe for submission to the jury. Beale v. Jones, 210 Va. 519, 522, 171 S.E.2d 851, 853 (1970) (quoting Hawkins v. Beecham, 168 Va. 553, 561, 191 S.E. 640, 643 (1937)).

Alternatively, the jury was entitled to believe Dr. Berry's testimony that Tuggle's wounds only required some outpatient care. From this testimony the jury could infer that Tuggle's wounds were not life-threatening in themselves. Taken with Dr. Suzuki's testimony, the jury could infer that these non-life-threatening injuries left untreated by a medical professional resulted in pneumonia and led to his death. Thus, the jury could have found that Tuggle's death

- 20 -

would not have occurred but for Wagoner's actions, namely his directions to the staff to bring Tuggle back to Minor Street while en route to the hospital, and his decision to keep Tuggle at the home even though there is evidence that he saw for himself the seriousness of Tuggle's burns.

"Great respect is accorded a jury verdict." Hall v. Hall, 240 Va. 360, 363, 397 S.E.2d 829, 831 (1990). The "time-honored standard" that a court must apply in deciding whether to approve a verdict is:

> "If there is conflict of testimony on a material point, or if reasonably [fair minded] men may differ as to the conclusions of fact to be drawn from the evidence, or if the conclusion is dependent upon the weight to be given the testimony, in all such cases the verdict of the jury is final and conclusive and cannot be disturbed either by the trial court or by this court, or if improperly set aside by the trial court, it will be reinstated by this court."

Id. (quoting Forbes & Co. v. S. Cotton Oil Co., 130 Va. 245, 259, 108 S.E. 15, 19 (1921)). Based on the evidence in this case, we find that fair minded men and women could differ as to whether Wagoner's actions and/or inactions constituted neglect that resulted in Tuggle's death, thus the trial court properly submitted the question to the jury.

Wagoner argues that the Commonwealth must have proved a *probability* that Tuggle would have survived with different treatment, or in other words, a greater than fifty percent chance of survival. We do not agree. If the only evidence in this case was Dr. Whaley's testimony that Tuggle only had a twenty-five percent chance of survival, a jury could find that Wagoner's act of calling Tuggle back while en route to the hospital and failure to correct his action by seeking professional medical treatment hastened Tuggle's death and destroyed his twenty-five percent chance of survival. It would defeat the purpose of Code § 18.2-369(B) to relieve Wagoner of criminal liability only because Tuggle did not have a fifty-one percent chance of survival.

Further, Wagoner's position is not founded in Virginia law. Virginia case law[6] does not hold that the Commonwealth must prove a probability of greater than fifty percent chance of the victim's survival absent the defendant's neglect in order to create a jury question on proximate cause of death. While the Supreme Court in Blondel advised against including the substantial possibility of survival in jury instructions, it affirmed that the law of Virginia is that where there is at least a *substantial possibility* of survival, proximate causation of death is a question for the jury. Blondel, 241 Va. at 472-73, 403 S.E.2d at 343.

The Virginia Supreme Court has clearly not equated a "substantial possibility of survival" to a "probability" of survival and common sense suggests that a "substantial possibility" is somewhat less of a quantification than a "probability." "[O]ur decisions have stated emphatically, in medical malpractice-wrongful death cases, that a defendant physician's destruction of 'any substantial possibility of the patient's survival' is 'a proximate cause of the patient's death.'" Id. at 472, 403 S.E.2d at 343.

> "When a physician's or surgeon's negligent action or inaction has effectively terminated a person's chance of survival, he will not be permitted to raise conjectures as to possible chances for survival that he has put beyond realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened if certain actions had been taken. The law does not in all circumstances require a plaintiff to show a certainty that a patient would have lived had he been operated on promptly."

Id. at 473, 403 S.E.2d at 343 (quoting Whitfield v. Whittaker Mem. Hosp., 210 Va. 176, 184, 169 S.E.2d 563, 568-69 (1969)). The Supreme Court also held in Brown v. Koulizakis, 229 Va. 524, 532, 331 S.E.2d 440, 446 (1985), "in a death case, if a defendant physician, by action or

---

[6] "Established principles of proximate causation are applicable in both civil and criminal cases." Brown v. Commonwealth, 278 Va. 523, 529, 685 S.E.2d 43, 46 (2009).

inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death."

In Murray v. United States, 215 F.3d 460 (4th Cir. 2000), the Fourth Circuit found in its review of Virginia case law that Virginia adheres to "the traditional standard of proximate cause and that requiring a plaintiff to prove destruction of a 'substantial possibility of survival' is equivalent to requiring the plaintiff to prove that it is 'more likely than not' that the decedent would have survived in the absence of the defendant's negligence." Id. at 463. The Fourth Circuit states that in traditional negligence cases, "the plaintiff must prove that the 'defendant's breach of duty was more likely than not (i.e., probably) the cause of injury.'" Id. (quoting Hurley v. United States, 923 F.2d 1091, 1094 (4th Cir. 1991)). The Fourth Circuit reached the conclusion that Virginia courts interpret "substantial possibility of survival" as equivalent to "probability of survival" after a review of the Virginia Supreme Court opinions, none of which explicitly reach this conclusion. See Whitfield, 210 Va. at 184, 169 S.E.2d at 568-69 ("When a physician's or surgeon's negligent action or inaction has effectively terminated a person's chance of survival, he will not be permitted to raise conjectures as to possible chances for survival that he has put beyond realization.");[7] Brown, 229 Va. at 533, 331 S.E.2d at 446 (There was evidence

---

[7] Our sister state courts have *not* interpreted Whitfield as following a traditional "probability" test. See Hastings v. Baton Rouge General Hospital, 498 So. 2d 713, 720 (La. 1986) (citing Whitfield for the proposition that "It is not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival."); Fennell v. Southern Maryland Hosp. Center, Inc., 580 A.2d 206, 208-09 (Md. 1990) (citing Brown and Whitfield, and noting that Virginia is one of many jurisdictions recognizing the "loss of chance doctrine," meaning the "net loss of chance of survival directly attributable to the negligence" where the likelihood of recovery from the pre-existing injury, prior to any alleged negligent treatment, was improbable, i.e. 50% or less); Kramer v. Lewisville Memorial Hosp., 858 S.W.2d 397, 407-09 n.1 (Tex. 1993) (stating that at least sixteen states have abandoned its "all or nothing" approach in favor of some version of the loss of chance doctrine, and citing Whitfield as a case showing a trend towards the application of the "loss of chance doctrine" to medical malpractice cases); Thornton v. CAMC, 305 S.E.2d 316 (W. Va. 1983) (including Virginia as a jurisdiction that has adopted the "value of a chance" theory, citing Whitfield).

to support a finding that the doctor's negligence was the proximate cause of death because a prompt diagnosis would have enabled proper treatment with medication "which would have substantially increased the patient's chances of living, according to the testimony."); Hadeed, 237 Va. at 287, 377 S.E.2d at 594 (The evidence indicated that if Hadeed had received the proper treatment at the time the doctor examined him, "he would have had a substantial *possibility* of surviving." (emphasis added)); Griffett v. Ryan, 247 Va. 465, 471, 443 S.E.2d 149, 152 (1994) (The "high likelihood" that an operation would have resulted in the patient being saved was sufficient evidence that the treating doctor's negligence destroyed "any substantial possibility" of the patient's survival and thus was sufficient evidence that the treating doctor's negligence was the proximate cause of the plaintiff's death.); Poliquin v. Daniels, 254 Va. 51, 57, 486 S.E.2d 530, 534 (1997) ("A defendant physician's action or inaction which 'has destroyed any substantial possibility of the patient's survival' is a proximate cause of the patient's death.").

While in the above cited Virginia cases there was evidence of a greater than fifty percent chance of survival absent the defendant's negligence, the Supreme Court has not said that a greater than fifty percent chance of survival is required to find a "substantial possibility of survival." The Supreme Court did not enter into any discussion about the "substantial possibility of survival" equating to a "probability of survival" in any of these cases. Virginia cases repeatedly cite the "substantial possibility of survival" without qualifying the "possibility."

For these reasons, we reject this assignment of error as well.

## C. Willful Neglect

Wagoner's final assignment of error is,

> The trial court erred in denying [Wagoner's] Motion to Set Aside
> the Jury Verdict when the evidence failed to establish that
> [Wagoner] committed a willful act with knowledge and
> consciousness that injury or death would result to Tuggle, as
> required by [Code] § 18.2-369(B). The evidence clearly
> established that [Wagoner] and all other administrative staff were

- 24 -

> consistently told by his caregivers that Tuggle was receiving the care recommended by the hospital and pharmacy and that his condition was improving.

This Court must review the jury's factual conclusions with the highest degree of appellate deference, deferring to the jury's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Ervin v. Commonwealth, 57 Va. App. 495, 502-03, 704 S.E.2d 135, 138-39 (2011).

The jury was instructed as to the meaning of "neglect" and "willful." Instruction 15 read: "'Neglect' means the knowing and willful failure by a responsible person to provide treatment, care, goods or services which results in injury to the health or endangers the safety of an incapacitated adult." Instruction 17 read:

> "Willful" describes conduct that must be knowing or intentional, rather than accidental, and undertaken without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose. "Willful" contemplates an intentional, purposeful act or omission in the care of an incapacitated adult by one responsible for that adult's care.

These jury instructions state the definition for "neglect" exactly as it is found in Code § 18.2-369. The jury instruction for "willful" is taken verbatim from Correll v. Commonwealth, 269 Va. 3, 12-13, 607 S.E.2d 119, 124 (2005), where the Supreme Court affirmed this Court and the trial court's conclusions that the defendant knowingly and willfully neglected her incapacitated mother and thus affirmed her conviction under Code § 18.2-369.

Wagoner cites Shanklin v. Commonwealth, 53 Va. App. 683, 674 S.E.2d 577 (2009), a child neglect case where the appellant's conviction was reversed because this Court found the evidence did not show that she recognized the severity of the child's injuries and willfully disregarded the importance of obtaining medical assistance. Id. at 689, 674 S.E.2d at 580. The child had been burned prior to arriving at the appellant's home. The child's second degree burns had been treated by his parents with ointment and then wrapped with gauze and secured with

duct tape. Appellant was told the child had some burns from playing in hot water. However, the wounds were completely bound so that appellant could not see the extent of his injuries and the child did not show any signs of discomfort. Id. at 690, 674 S.E.2d at 580.

This case is more akin to Flowers v. Commonwealth, 49 Va. App. 241, 248-50, 639 S.E.2d 313, 317 (2007), where this Court affirmed appellant's conviction for felony child neglect, finding that the evidence supported that Flowers acted willfully in neglecting to seek medical care for the child. "[E]ven though Flowers believed that the children had taken something and that they needed immediate medical attention, she failed to call 911 or to take any other prompt action to secure medical attention for the child." Id. at 248, 639 S.E.2d at 317. She waited three hours to call the child's father who lived some distance away, and requested that he refrain from calling the police or the child's mother to avoid "any hoopla." Id. Under the totality of the circumstances, a reasonable fact finder could find that the appellant's "actions and deliberate inaction" "'created a situation placing the child at risk of actual physical harm.'" Id. at 249, 639 S.E.2d at 317 (quoting Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 110 (2004)). Thus, the Court affirmed the trial court's classification of the appellant's conduct as a "willful omission" for purposes of Code § 18.2-371.1(B)(1). Id.

Unlike in Shanklin, in the present case Wagoner was able to view Tuggle's burns about twelve hours after Tuggle sustained the injuries. Like in Flowers, the jury was entitled to believe that Wagoner knew that Tuggle was severely burned, but did not seek proper treatment for Tuggle in order to avoid undesirable personal consequences. Collins testified that on the morning of February 9, staff members stood Tuggle up in front of Wagoner and Tuggle was not wearing clothes, indicating that Wagoner could see all of Tuggle's burns. Collins was "in shock" when he saw Tuggle's "very bad" burns. He described that there was no flesh on the

back of Tuggle's head, his hair was melted to him, and there were burns down to his feet.  He also noted that Tuggle looked like he was hurting.

Baker testified that Tuggle's t-shirt was lifted up to his shoulders so Wagoner could inspect Tuggle's wounds and Tuggle's skin was really red and the skin had peeled away.  Kenny A. decided Tuggle's burns were bad enough that he should send Tuggle to the hospital that morning.  The jury was entitled to believe the testimony of these witnesses and to infer that Wagoner also saw that Tuggle had very severe burns, and not a minor "sunburn" type injury.  Epley also testified that the situation at Minor Street on February 9 was chaotic and overwhelming and everybody was talking at once.  The jury could infer from her testimony that the employees present thought a significant injury had occurred and their concern fueled a chaotic environment.

Then there is the evidence that Wagoner recalled the van as it was transporting Tuggle to the hospital on February 9 so he could take a look at Tuggle.  Wagoner looked at Tuggle and then sat in the privacy of Epley's car and expressed concern that Social Services was going to investigate them.  Collins saw from a distance that Wagoner acted upset and agitated in the car.  Later the same day, Epley twice encouraged Wagoner to report the incident but he did not report Tuggle's injuries to the Office of Licensing until seven days later and only because the police made a wellness check on Tuggle.  The jury was entitled to consider all of these circumstances and could infer that Wagoner decided not to seek professional medical care for Tuggle in order to avoid investigation and to protect his own self interests.  The jury was entitled to disregard Wagoner's story that he thought Tuggle only had a minor injury and that he relied on the advice Tarpley relayed from a pharmacist and someone at the hospital who had never observed Tuggle's wounds.  The jury was also entitled to consider that Wagoner knew his employees, upon whom he relied to educate him on Tuggle's condition, did not have any advanced burn training.  Given

the totality of the circumstances, a reasonable fact finder could conclude that Wagoner acted purposefully and willfully in failing to seek professional medical care for Tuggle.

### III.  CONCLUSION

For the foregoing reasons, we hold that the trial court did not err in denying Wagoner's motion to set aside the jury verdict.

Affirmed.

Huff, J., dissenting, in part.

I respectfully dissent because 1) the standard articulated by the trial court when denying appellant's motion to set aside the jury verdict was the very standard that was rejected by the Supreme Court in Blondel v. Hays, 241 Va. 467, 473-74, 403 S.E.2d 340, 344 (1991), as an incorrect statement of the law of proximate cause in the Commonwealth, and 2) the jury's determination that appellant's abuse and neglect of Tuggle resulted in Tuggle's death was "'plainly wrong [and] without credible evidence to support it,'" Doherty v. Aleck, 273 Va. 421, 424, 641 S.E.2d 93, 94 (2007) (quoting Lane v. Scott, 220 Va. 578, 581, 260 S.E.2d 238, 240 (1979)). Consequently, I would hold that the trial court erred in applying an incorrect standard to, and in subsequently denying, appellant's motion to set aside the jury's verdict.

Code § 18.2-369(B) provides that "[a]ny responsible person who abuses or neglects an incapacitated adult in violation of this section and the abuse or neglect results in the death of the incapacitated adult is guilty of a Class 3 felony." It is uncontested that appellant is a "responsible person" under the statute. Thus, the issue on appeal is whether the jury's determination that appellant's abuse or neglect "result[ed] in" Tuggle's death is supported by credible evidence. Code § 18.2-369(B).

I agree with the majority's observation, based on the United States Supreme Court's opinion in Burrage v. United States, 134 S. Ct. 881 (2014), that the phrase, "results in the death," as it is used in Code § 18.2-269(B), is the functional equivalent of "proximately causes the death."[8] "A frequently quoted definition of proximate cause is that it is a cause 'which, in

---

[8] While the United States Supreme Court in Burrage distinguished between "actual cause" and "legal cause [often called proximate cause]" and then went on to address the "results from" language only in the context of actual cause, 134 S. Ct. at 887-88, "there are inconsistencies in the national legal nomenclature as to whether [actual cause] is considered to be a subset of proximate cause or whether [actual cause], in addition to proximate cause, . . . together create legal cause." Ford Motor Co. v. Boomer, 285 Va. 141, 151 n.2, 736 S.E.2d 724, 728 n.2 (2013). Our Supreme Court has indicated, however, that "the former nomenclature . . . is

natural and continuous sequence . . . produces the injury, and without which the result would not have occurred.'" Scott v. Simms, 188 Va. 808, 816-17, 51 S.E.2d 250, 253 (1949). "[T]he first element of proximate cause, causation in fact, is often described as the 'but for' rule." Ford Motor Co. v. Boomer, 285 Va. 141, 150, 736 S.E.2d 724, 728 (2013). A "but-for cause," which is "[a]lso termed actual cause; cause in fact; [and] factual cause," is a "cause without which the event could not have occurred." Black's Law Dictionary 250 (9th ed. 2009). In the present case, the above, well-settled principles of proximate cause in Virginia were accurately reflected in Jury Instruction No. 17, which provided that "[a] proximate cause of death is a cause that, in natural and continuous sequence, results in death. *It is a cause without which the death would not have occurred.*" (Emphasis added).[9]

Rule 3A:15 establishes the standards to be applied by a trial court when considering a motion to strike and a motion to set aside a jury verdict. In pertinent part, the standard is the same for both motions – whether "the evidence is sufficient as a matter of law to sustain a conviction." Rule 3A:15(a), (b). Indeed, as the majority points out, under this standard and Code § 8.01-680 the trial court "shall not set aside [a jury verdict] unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it."

> "If there is a conflict in the testimony on a material point, or if reasonable [persons] may differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, the trial judge cannot substitute

---

the more widely used terminology in Virginia . . . ." Id. Consequently, the United States Supreme Court's analysis of actual cause in Burrage is applicable to our analysis of proximate causation in the present case.

[9] As the majority notes, this instruction was uncontested and thus, at a minimum, is the law of the case. Owens-Illinois, Inc. v. Thomas Baker Real Estate, Ltd., 237 Va. 649, 652, 379 S.E.2d 344, 346 (1989) ("instructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review").

> his conclusion for that of the jury merely because he would have voted for a different verdict if he had been on the jury."

Doherty, 273 Va. at 424, 641 S.E.2d at 94 (quoting Lane, 220 Va. at 581, 260 S.E.2d at 240).

When considering a motion to strike the evidence as insufficient to establish proximate cause in a wrongful death case, however, the Supreme Court has provided additional "guidance" to trial courts beyond the standard established in Rule 3A:15(a). Blondel, 241 Va. at 473-74, 403 S.E.2d at 344. Specifically, the Supreme Court stated that when

> deciding a motion to strike the evidence . . ., if a plaintiff's evidence has shown that the defendant's negligence *has destroyed any substantial possibility of the patient's survival*, then there is sufficient evidence of proximate cause to go to the jury, and *a motion to strike the evidence* on that ground should be overruled.

Id. at 474, 403 S.E.2d at 344 (emphasis added). Considering this additional guidance in the present case, at the motion to strike stage, the evidence established that without treatment, Tuggle had a 100% chance of dying from his burns. With treatment, however, he would have had a thirteen to twenty-five percent chance of survival. Consequently, when appellant decided not to send Tuggle to the hospital, he destroyed a substantial possibility of Tuggle's survival. Thus, the trial court denied appellant's motion to strike the evidence as insufficient to establish proximate cause and sent the issue to the jury.

The Supreme Court went on in Blondel, however, to explain that "'[t]he substantial possibility of survival' standard, while furnishing the criterion for deciding a motion to strike, was never designed for the guidance of a jury." 241 Va. at 474, 403 S.E.2d at 344. This is because the "substantial possibility of survival" standard is *not* the law of proximate cause in the Commonwealth. Id. at 474-75, 403 S.E.2d at 344 ("Courts in a number of other jurisdictions have adopted the 'substantial possibility of survival' standard for jury instructions . . ., [but] we are not persuaded of the wisdom of that policy."); see also Cooper v. Commonwealth, 2 Va. App. 497, 500, 345 S.E.2d 775, 777 (1986) (jury instructions must accurately reflect "*the*

*law* of the case applicable to the facts" (emphasis added)).  Rather, it is to be "employed as a decisional standard for the *guidance* of trial courts in deciding a motion to strike the evidence" as insufficient to establish proximate cause in wrongful death cases.  Blondel, 241 Va. at 473-74, 403 S.E.2d at 344 (emphasis added).  In other words, once a case makes it past the motion to strike stage, the jury's function is to decide the issue of "proximate cause" according to the Commonwealth's "well-settled law," not according to whether a substantial possibility of survival was destroyed.  Id. at 474, 403 S.E.2d at 344.  Our Supreme Court did not intend for the "substantial possibility of survival" standard to be applied when considering a motion to set aside a jury verdict for lack of proximate cause, as the majority suggests.

Consequently, when considering a motion to set aside a jury verdict for lack of proximate cause of death, a trial court should not seek to determine whether the evidence established that a substantial possibility of a victim's survival was destroyed, but rather, it should seek only to determine whether "the evidence is insufficient *as a matter of law* to sustain a conviction."  Rule 3A:15(b) (emphasis added).  Accordingly, when considering appellant's motion to set aside the jury verdict in the present case, the trial court should have considered the well-settled law of proximate cause in the Commonwealth, and then asked whether the jury's determination that appellant's abuse or neglect proximately caused Tuggle's death was "'plainly wrong or without credible evidence to support it.'"  Doherty, 273 Va. at 424, 641 S.E.2d at 94 (quoting Lane, 220 Va. at 581, 260 S.E.2d at 240).

In its letter opinion denying appellant's motion to set aside the jury verdict, however, the trial court inappropriately applied the "substantial possibility of survival" standard as the law of proximate cause in the Commonwealth, stating that "[i]n the court's view, a twenty-five percent chance of survival represents a substantial possibility of survival, and the jury was entitled to

find that [appellant's] abuse or neglect of Tuggle was a proximate cause of his death."[10]  In so holding, the trial court specifically relied upon Brown v. Koulizakis, 229 Va. 524, 331 S.E.2d 440 (1985), and Whitfield v. Whittaker Mem. Hosp., 210 Va. 176, 169 S.E.2d 563 (1969), in which the trial courts were reversed for incorrectly *striking plaintiff's evidence*.  Blondel, 241 Va. at 473, 403 S.E.2d at 344.  The "substantial possibility of survival" standard, however, was rejected by the Supreme Court as an incorrect statement of the law of proximate cause.  Id. at 474-75, 403 S.E.2d at 344 ("Courts in a number of other jurisdictions have adopted the 'substantial possibility of survival' standard for jury instructions . . ., [but] we are not persuaded of the wisdom of that policy.").

In deciding a motion to set aside a jury verdict, the appropriate inquiry is whether "the evidence is insufficient *as a matter of law* to sustain a conviction."  Rule 3A:15(b) (emphasis added).  Deciding whether the evidence was sufficient to support the jury's verdict, as a matter of law, requires the trial court to apply the correct law – in this case, on the issue of proximate causation.[11]  That appears not to have been done.  Accordingly, I would hold that when considering appellant's motion to set aside the jury verdict, the trial court erred by applying a decisional standard intended only as "guidance" when deciding a *motion to strike the evidence*.

_____

[10] The majority's suggestion that "a jury could find that Wagoner's act of calling Tuggle back while en route to the hospital and failure to correct his action by seeking professional medical treatment hastened Tuggle's death and destroyed his twenty-five percent chance of survival" also has the effect of applying the "substantial possibility of survival" standard as the law of proximate cause in Virginia.

[11] Although the same language is used in Rule 3A:15 for deciding a motion to strike the evidence and a motion to set aside a verdict, the Supreme Court, in Blondel, has provided additional guidance for a trial court to apply in considering a motion to strike the evidence on the issue of proximate cause in death actions, 241 Va. at 473-74, 403 S.E.2d at 344, favoring submission of such cases to the jury.  This additional guidance does not change the Commonwealth's law of proximate causation and therefore does not lessen the standard for considering a motion to set aside a jury verdict.

- 33 -

I would further hold that the trial court erred in denying the motion to set aside the jury verdict because the jury's determination that appellant's abuse or neglect of Tuggle was a proximate cause of Tuggle's death was "'plainly wrong [and] without credible evidence to support it.'" Doherty, 273 Va. at 424, 641 S.E.2d at 94 (quoting Lane, 220 Va. at 581, 260 S.E.2d at 240).

Suzuki testified that thirty percent of Tuggle's body was burned and that his cause of death was sepsis and pneumonia resulting from these thermal injuries. Whaley testified that without treatment, Tuggle's risk of death was 100%, and with treatment, he had a thirteen to twenty-five percent chance of survival. This evidence establishes that, in all probability, Tuggle would have died regardless of appellant's abuse or neglect. No evidence was presented, and no inference could arise, suggesting a likelihood of survival "but for" appellant's abuse and neglect. As such, no reasonable trier of fact could have found, beyond a reasonable doubt, that "but for" appellant's abuse or neglect, Tuggle would have survived. Or, in other words, no reasonable trier of fact could have found, beyond a reasonable doubt, that without appellant's abuse or neglect Tuggle's death would not have occurred.[12]

The facts of the present case are similar to the majority's hypothetical example of an incapacitated adult who becomes ill or injured through no fault of the responsible party, and the "prompt or heroic measures" of the responsible party would not save the victim from death. As the majority notes, in this scenario, the responsible party's inaction would not qualify as a proximate cause of the victim's death. Similarly, in the present case, no evidence was presented upon which a jury could base its verdict that appellant's abuse or neglect was a proximate cause

---

[12] I respectfully suggest that the extent to which the majority relies on Dr. Berry's testimony, regarding Tuggle's cause of death, as evidence to support the jury's determination is misplaced because the trial court declined to qualify Berry as an expert in forensic pathology, holding that "Dr. Berry cannot express an opinion as to cause of death because that is outside his area of expertise."

of death.  I, therefore, would hold that the jury's determination that appellant's abuse or neglect of Tuggle was a proximate cause of Tuggle's death was unsupported, as a matter of law.  For the foregoing reasons, I respectfully dissent.[13]

---

[13] I do not differ with the majority as to appellant's third assignment of error, although I would reverse without reaching that issue.